## MASTER EQUIPMENT FINANCE AGREEMENT

**THIS MASTER EQUIPMENT FINANCE AGREEMENT** (the "Master Agreement") is dated as of February **9**, 2017 between Atlas SN Leasing Inc., a(n) Illinois corporation (the "Borrower") with a principal place of business at 2500 Devon Avenue, Elk Grove Village, IL 60007, and **WOODFOREST NATIONAL BANK**, a Texas bank (the "Bank") with a principal place of business at 28001 Cabot Drive, Suite 240, Novi, Michigan 48377. Certain definitions and rules of construction are provided on the attached **Exhibit A**.

1.     **GENERAL PROVISIONS.**

    1.1    <u>Master Agreement</u>. This Master Agreement contains terms and provisions under which Bank will from time to time finance items of Equipment owned or to be acquired by Borrower, which Items will be described on one or more Schedules incorporating the terms of this Master Agreement. Each Schedule, together with this Master Agreement as so incorporated, will constitute a separate Agreement. This Master Agreement is not a legal commitment to enter into any Schedule and, after executing a Schedule, provide any financing or otherwise extend credit to Borrower. Bank shall have no obligation under any Schedule until all conditions to funding specified herein or as required by Bank from time to time are completed to the satisfaction of Bank.

    1.2    <u>Term, Promise to Pay, Unconditional Obligations</u>. The Term of each Agreement shall begin on the Commencement Date and shall continue for the Term. Borrower promises to pay Installments and all Amounts Due under an Agreement to Bank without Notice or other written demand. <u>BORROWER'S OBLIGATION TO PAY ALL INSTALLMENTS AND AMOUNTS DUE UNDER EACH AGREEMENT IS ABSOLUTE AND UNCONDITIONAL UNDER ANY AND ALL CIRCUMSTANCES (INCLUDING ANY MALFUNCTION, DEFECT OR ANY INABILITY TO USE ANY ITEM OF EQUIPMENT) AND SHALL BE PAID AND PERFORMED BY BORROWER WITHOUT NOTICE OR DEMAND AND WITHOUT ANY ABATEMENT, REDUCTION, DIMINUTION, SETOFF, DEFENSE, COUNTERCLAIM OR RECOUPMENT WHATSOEVER, INCLUDING ANY PAST, PRESENT OR FUTURE CLAIMS THAT BORROWER MAY HAVE AGAINST BANK, ANY SUPPLIER OR ANY OTHER PERSON WHATSOEVER.</u> Borrower acknowledges that certain of its Obligations and duties under an Agreement begin prior to the Commencement Date (including, but not limited to, providing insurance prior to shipment) and may continue past the expiration or termination of such Agreement (including, but not limited to, Borrower's indemnification obligations).

    1.3    <u>Selection, Disclaimer of Warranties</u>. Borrower acknowledges and agrees that: (a) it has selected the Equipment and has not relied on any representation or warranty by Bank in connection with such selection; and (b) neither Bank nor any of Bank's officers or employees is an agent of any Supplier and neither Supplier nor any of Supplier's officers or employees is an agent of Bank nor otherwise authorized to bind Bank to any representation, warranty, term, condition or agreement. Borrower acknowledges that Bank's approval of Borrower's request for financing with respect to any Equipment, Supplier or other factors relating to any Agreement will be solely for the protection of Bank's interests and under no circumstances shall be construed to impose any responsibility or liability of any nature whatsoever on Bank. <u>BORROWER ACKNOWLEDGES AND AGREES THAT THE EQUIPMENT IS FINANCED "AS IS, WHERE IS AND WITH ALL FAULTS" AND BANK DOES NOT MAKE, HAS NOT MADE, AND SHALL NOT BE DEEMED TO MAKE, AND HEREBY DISCLAIMS ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, AS TO THE MERCHANTABILITY OR FITNESS OF THE EQUIPMENT FOR ANY USE OR PURPOSE, THE DESIGN, DURABILITY, QUALITY, CAPACITY, CONDITION, COMPLIANCE WITH SPECIFICATIONS, OPERATION OR ANY CHARACTERISTICS OF THE EQUIPMENT WHATSOEVER, OR AS TO TITLE TO THE EQUIPMENT, OR ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE EQUIPMENT (EITHER UPON DELIVERY THEREOF TO BORROWER, BANK OR OTHERWISE)</u>, it being agreed that all such risks, as between Bank and Borrower, are to be borne by Borrower. Bank shall have no responsibility or liability to Borrower or any other person with respect to any of the following, (i) any liability, loss or damage to Borrower or any third party caused or alleged to be caused directly or indirectly by any Item, any inadequacy thereof or deficiency or defect therein or by any other circumstance in connection therewith, including the delivery, transportation, ownership, possession, use, operation, performance, servicing, maintenance, storage, repair, improvement, replacement, reconstruction or return of any Item or any risks relating thereto; or (ii) any interruption of service, loss of business or anticipated profits or consequential damages.

2.     **PAYMENTS TO BANK.**

    2.1    <u>Default Rate, Late Payment</u>. Notwithstanding any provision herein or in any other Transaction Document to the contrary, upon the occurrence and during the continuance of an Event of Default, the interest rate payable on any Agreement or Obligation owed to the Bank shall be the Default Rate. If any Installment or other Amount Due under an Agreement, is not paid when due, Borrower agrees to pay a late charge equal to five percent (5%) of the amount of the payment which is late, but not more than the maximum amount allowed by applicable Law nor less than $10.00. The foregoing provision shall not be deemed to excuse a late payment or be deemed a waiver of any other rights Bank may have under an Agreement, including, subject to the terms hereof, the right to enforce any remedy available to Bank thereunder.

    2.2    <u>Payment to Bank</u>. Timeliness of Borrower's payments and other performance is of the essence of each Agreement. All Installments and Amounts Due payable to Bank under each Agreement or other Transaction Document shall be paid directly to Bank in immediately available funds at the Place for Payment, provided that if requested by Bank, Borrower will execute and deliver to Bank a request for automatic debit authorization on a form provided by Bank. All payments to be made by Borrower hereunder will be made to Bank not later than 2:00 p.m. at the Place for Payment on the date due and payments received after 2:00 p.m. at the Place for Payment shall be deemed to be payments made prior to 2:00 p.m. at the Place for Payment on the next succeeding Business Day. Bank may charge against any deposit account of Borrower all or any part of any amount owed by Borrower hereunder, and Borrower hereby authorizes Bank to charge Borrower's accounts with Bank in order to cause timely payment of amounts due hereunder to be made (subject to sufficient funds being available in such account for that purpose). At the time of making a payment to Bank under each Agreement, Borrower shall, subject to the other terms and conditions of such Agreement, specify to Bank the Agreement or other Obligation of Borrower hereunder to which such payment is to be applied. In the event that Borrower fails to so specify the



{01049700-3/4001298/000001}1

relevant Agreement or if an Event of Default shall have occurred and be continuing, Bank may apply such payments to the Obligations as Bank may determine in its discretion.

2.3     Payment on Non-Business Day; Computations.  Whenever any Installment or Amount Due becomes due on a day that is not a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, in the case of any Installment, interest shall continue to accrue and be payable thereon at the rate per annum determined in accordance with each Agreement during such extension. All interest payable under each Agreement shall be calculated on the basis of a 360-day year.

2.4     Rate Limitation.  If, at any time, the interest rate payable on an Agreement shall be deemed by any competent court of law or any Governmental Authority to exceed the maximum rate of interest permitted by any applicable Laws, then, for such time as the interest rate would be deemed excessive, its application shall be suspended and there shall be charged instead the maximum rate of interest permissible under such Laws, and any excess interest actually collected by Bank shall be credited as a partial prepayment of principal.

3.      CONDITIONS PRECEDENT. The obligation of Bank to enter into any Schedule or make any Advance under a Schedule thereto is subject to the following conditions precedent:

3.1     Documents Required for the Initial Advance.  Prior to or concurrently with the Closing of the Initial Advance, the following instruments, documents, and things duly executed by all proper Persons, and all in form and substance satisfactory to Bank, shall have been delivered to Bank (a) this Master Agreement; the applicable Agreement; the Guaranty (if required by Bank); and the Closing Certificates; (b) The Financing Statements, together with evidence that the Financing Statements have been duly recorded in all filing offices that Bank may deem necessary or desirable in order to create a valid first priority Lien on the Collateral described therein in favor of Bank and that Taxes and fees have been paid and if requested by Bank, evidence that all other action that Bank may deem necessary or desirable in order to create a valid first priority Lien on the Collateral has been taken; (c) with respect to each Borrower Party (other than a Borrower Party that is an individual), a certificate of an officer or other representative acceptable to Bank, certifying as to the incumbency and signatures of the representative(s) of such Borrower Party signing, as applicable, each Agreement and each of the other Transaction Documents, and each other document to be delivered pursuant hereto, together with the following documents attached thereto: (1) A copy of the resolutions of such applicable Person's Governing Body authorizing the execution, delivery and performance of each Agreement, each of the Transaction Documents, and each other document to be delivered pursuant hereto, as applicable; (2) A copy, certified as of the most recent date practicable by the secretary of state (or similar Governmental Authority) of the state, province, or other Jurisdiction where such Person is organized, of such Person's Organizational Documents filed with such secretary of state (or similar Governmental Authority); and (3) A copy of such Person's other Organizational Documents; (d) a certificate, as of the most recent date practicable, of the secretary of state (or similar appropriate Governmental Authority) and department of revenue or taxation (or similar appropriate Governmental Authority) of each Jurisdiction in which each Borrower Party (other than a Borrower Party that is an individual) is organized as to the existence and good standing of each such Person within such Jurisdiction, and a certificate, as of the most recent date practicable, of the secretary of state (or similar appropriate Governmental Authority) of each state where any of the Collateral is located as to the qualification and good standing of Borrower as a foreign entity doing business in each such state; and (e) evidence satisfactory to Bank that Borrower has obtained all insurance policies as required under each Agreement and/or any of the other Transaction Documents, together with evidence satisfactory to Bank that all premiums therefor have been paid and that all such policies are in full force and effect; and all other items reasonably required to be provided to Bank and not otherwise set forth above

3.2     Documents Required for an Advance After the Initial Advance. Prior to or concurrently with each Closing of an Advance after the Initial Advance, the following instruments, documents, and things duly executed by all proper Persons, and all in form and substance satisfactory to Bank, shall have been delivered to Bank: (a) the applicable Agreement; the Guaranty (if required by Bank); (b) if required by Bank, the Financing Statements, together with evidence that the Financing Statements have been duly recorded in all filing offices that Bank may deem necessary or desirable in order to create a valid first priority Lien on the Collateral described therein in favor of Bank and that Taxes and fees have been paid and if requested by Bank, evidence that all other action that Bank may deem necessary or desirable in order to create a valid first priority Lien on the Collateral has been taken; (c) with respect to each Borrower Party, a copy of such Person's Organizational Documents if there has been any change, modification or amendment thereto since the Initial Advance; (d) a certificate, if not previously provided within the past twelve (12) months, of the secretary of state (or similar appropriate Governmental Authority) and department of revenue or taxation (or similar appropriate Governmental Authority) of each Jurisdiction in which each Borrower Party (other than a Borrower Party that is an individual) is organized as to the existence and good standing of each such Person within such Jurisdiction, and a certificate, as of the most recent date practicable, of the secretary of state (or similar appropriate Governmental Authority) of each state where any of the Collateral is located as to the qualification and good standing of Borrower as a foreign entity doing business in each such state; and (e) evidence satisfactory to Bank that Borrower has obtained all insurance policies as required under each Agreement and/or any of the other Transaction Documents, together with evidence satisfactory to Bank that all premiums therefor have been paid and that all such policies are in full force and effect; and all other items reasonably required to be provided to Bank and not otherwise set forth above. Nothing contained in this Section 3.1 or 3.2 shall restrict Bank's right to request or require additional information and/or documents from any Borrower Party to make an Advance until all conditions required by Bank are satisfied to Bank's discretion as further contemplated in Section 1.1.

3.3     Certain Events. At the time of each Closing, no Default or Material Adverse Change shall have occurred and be continuing; all of the Transaction Documents shall be in full force and effect; and Borrower shall have paid all Installments and Amounts Due and other costs, fees or amounts then owing to Bank.

3.4     Election to Make Advances Prior to Satisfaction of Conditions Precedent. In the event Bank, at its option, elects to make one or more Advances prior to receipt and approval of all items required by this Article, such election shall not constitute any commitment or agreement of Bank to make any subsequent Advance until all items required by this Article have been delivered.

4.   COLLATERAL SECURITY.

4.1   Grant of Security Interest.  As security for the prompt satisfaction of all Obligations, Borrower hereby grants to Bank a security interest, intended by the parties to be a first priority security interest, in and upon the Collateral.  All Collateral secures all Obligations, provided that Agreements shall not be so cross-collateralized if held by different Persons who are not Affiliates.  No submission by Borrower to Bank of a Schedule or other particular identification of Collateral shall be necessary to vest in Bank a security interest in each and every item of Collateral now existing or hereafter created and acquired, but rather such security interest shall vest in Bank immediately upon the creation or acquisition or any item of Collateral hereafter created or acquired, without the necessity for any other or further action by Borrower or by Bank.

4.2   Maintenance of Lien.  Borrower authorizes Bank to file one or more Financing Statements (including initial financing statements and continuation and amendment statements) to perfect Bank's Security Interest pursuant to the Uniform Commercial Code, such Financing Statements to be in form and substance as required by Bank. Borrower hereby appoints Bank as its attorney-in-fact (without requiring Bank to act as such) to file any Financing Statement in the name of Borrower, and to perform all other acts that Bank deems appropriate to perfect and continue Bank's Security Interest and to protect and preserve the Collateral. In connection with Bank's Security Interest, Borrower will execute and deliver, and cause to be executed and delivered, such documents and instruments, including amendments, in form reasonably satisfactory to Bank as Bank, from time to time, may specify, and pay, or reimburse Bank upon demand for paying, all costs and taxes of filing or recording the same in such Jurisdictions as Bank may designate; and take such other steps as Bank, from time to time, may reasonably direct to protect, perfect, and maintain Bank's Security Interest.

4.3   Titled Equipment.  Borrower hereby irrevocably appoints Bank and its designee and authorizes and grants to Bank and such designee a power of attorney in Borrower's name as Borrower's attorney-in-fact to apply for and execute a certificate of title and/or notice of liens for any Item of Titled Equipment where such Titled Equipment is or may be used and/or to transfer title thereto upon the exercise by Bank of its remedies upon an Event of Default by Borrower under this Master Agreement, provided that Borrower shall furnish to Bank all certificates of title within thirty (30) days of any titling effected by Borrower. Additionally, Borrower will do whatever Bank deems necessary to have a statement of the Lien of Bank and any assignee of Bank in the Titled Equipment noted on any certificate of title relating thereto and will deliver said certificate to Bank.

5.   REPRESENTATIONS AND WARRANTIES. Borrower represents and warrants to Bank, knowing that Bank will rely on such representations and warranties as an inducement to enter into each Agreement, that:

5.1   Existence, Authority & Approvals. Each Borrower Party that is not an individual is duly organized, validly existing and in good standing under the laws of such Borrower Party's state of formation or incorporation, is qualified to do business and in good standing under the laws of each state in which each Borrower Party operates and possess any Item which would require such qualification or authority to conduct its business and the name of each Borrower Party provided on each Transaction Document to which such Borrower Party is a party thereto contains the correct legal name of such Borrower Party.  Each Borrower Party has full power and authority to consummate the transactions contemplated by each Transaction Document to which such Borrower Party is party thereto. The execution, delivery and performance of this Master Agreement, each Agreement and each other Transaction Document has been, or will be when entered into, duly authorized by all necessary action of the applicable Borrower Party, duly executed on behalf of such Borrower Party and constitutes a valid and legally binding obligation of such Borrower Party, enforceable in accordance with its terms.  The execution and performance by each Borrower Party of each Transaction Document to which such Borrower Party is a party thereto and the validity hereof and thereof, do not require the consent or approval of, giving of notice to, registration with, or taking of any other action in respect of, any Third Party, state, federal or other governmental authority or agency, any shareholders, partners, members, trustees or holders of any indebtedness of such Borrower Party; or if any such consent, approval, notice, registration or action is required, it has been obtained, given or taken, and evidence thereof has been delivered to Bank or will be delivered concurrently with the execution of each such Transaction Document; the execution, delivery or performance by Borrower of its Obligations under each Agreement and the obligations of each other Borrower Party to Bank shall not contravene, in any material respect (i) any Law; (ii) any provision in such Borrower Party's Organizational Documents, instruments or agreements; (iii) any provision in any existing mortgage, indenture, loan or credit agreement, or other contract or agreement binding on such Borrower Party.

5.2   Violations, Actions Pending. There are no actions, suits, or proceedings pending or, to Borrower's knowledge, threatened, which might have a Material Adverse Effect or which might impair the value of the Collateral.  To Borrower's knowledge, (i) each Borrower Party is not in violation of any agreement the violation of which will or might reasonably be expected to have a Material Adverse Effect, and (ii) each Borrower Party is not in violation of any order, judgment, or decree of any court, or any statute or governmental regulation to which such Borrower Party is subject.  The execution and performance of each Transaction Document by the applicable Borrower Party will not result in any breach of any credit or loan agreement or any other instrument which may bind or affect any Borrower Party.

5.3   Supplier. Neither  Bank nor any of Bank's officers or employees is an agent of any Supplier; and neither Supplier nor any of Supplier's officers or employees is an agent of Bank nor otherwise authorized to bind Bank to any representation, warranty, term, condition or agreement.

5.4   Financial Statements; Solvency, Tax Filings.  (A) All financial statements of each Borrower Party heretofore given and hereafter to be given to Bank are and will be true and complete in all material respects as of their respective dates, and fairly represent and will fairly represent the financial conditions of such Borrower Party, and no Material Adverse Change has occurred or to the knowledge of Borrower will occur in the financial conditions reflected therein after the respective date thereof upon delivery to Bank, unless Borrower notifies Bank in writing of the same; (B) each Borrower Party is Solvent; and (C) Except as may otherwise be permitted herein, (1) all federal, state, local and other tax returns and reports of each Borrower Party required by Laws have been completed in full and have been duly filed, and all taxes, assessments and withholdings shown on such returns or billed to such Borrower Party have been paid, (2) each Borrower Party maintains adequate provisions and accruals in respect of all

such federal, state, local and other taxes, assessments and withholdings and (3) there are no unpaid assessments pending against a Borrower Party for any taxes or withholdings, and Borrower knows of no basis therefor.

5.5     Title. Borrower has good and marketable title to the Collateral, subject to no Liens, except for Bank's Security Interest.

5.6     Locations of Equipment; Fixtures Unless otherwise disclosed to Bank, Borrower is, and will continue through the Term of each Agreement to be, either the owner, the lessee or the sublessee of each and every facility in which any Item shall be located. It is the intention of the parties hereto that the Equipment shall consist solely of personal property and that the same shall not constitute fixtures under the laws of the states where an Item of Equipment is located. The parties acknowledge and agree that the Equipment is and shall remain removable from, and not essential to, the premises where the Equipment is located.

5.7     Priority of Liens. Bank's Security Interest constitutes a first priority security interest against the Collateral, prior to all other Liens, including those, which may hereafter accrue, except for the Bank's Security Interest. Borrower shall notify Bank in writing within five (5) days after any Lien shall attach to any Item, and any such notice shall specify the location of such Item on the date of such notification, the amount and circumstances of any claim giving rise to such Lien and the identity and address of the lienholder.

5.8     Accuracy of Documents, Continuing Effectiveness. All documents and other things furnished to Bank by or on behalf of any Borrower Party as part of or in support of the application for this Master Agreement or pursuant to an Agreement are true, correct, and complete, and accurately represent the matters to which they pertain All representations and warranties contained herein shall be deemed continuing and in effect at all times while Borrower remains indebted to Bank pursuant to this Master Agreement and shall be deemed to be incorporated by reference in each Agreement unless Borrower specifically notifies Bank of any change therein.

5.9     Anti-Terrorism Laws. No Borrower Party is in violation of any Anti-Terrorism Law, and no Borrower Party engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. No Borrower Party is any of the following (each a "Blocked Person"): (i) A Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (ii) Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (iii) a Person with which any bank or other financial institution is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (iv) a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; (v) Person that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list; or (vi) a Person who is affiliated with a Person listed above. No Borrower Party (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224.

5.10    No Reliance. Borrower has not relied on any representation, warranty, advice, recommendation or other statement of any kind, oral or written, express or implied, in evaluating and determining to enter into the transactions contemplated hereby and by each Agreement, including without limitation any such statement as to the possible legal, tax or accounting treatment or consequences of such transactions.

6.      BORROWER'S COVENANTS. Borrower does hereby covenant and agree with Bank that, so long as any of the Obligations remain unsatisfied or any commitments hereunder remain outstanding, Borrower at all times will comply or cause to be complied with the following covenants:

6.1     Affirmative Covenants. Borrower will (a) duly and promptly pay and perform all of Borrower's Obligations to Bank according to the terms of each Agreement, the other Transaction Documents and will cause each other Borrower Party to perform such other Borrower Party's Obligations to Bank according to the terms of such Transaction Document; (b) use the proceeds of any Advance for the acquisition of Equipment acceptable to Bank from Supplier's acceptable to Bank or for working capital needs of Borrower and purposes otherwise approved by Bank, and Borrower will furnish Bank such evidence as it may reasonably require with respect to such uses and no transaction under any Agreement will be a Consumer Transaction (c) furnish or cause to be furnished to Bank during the term of each Agreement (and Bank agrees that any of the financial reporting requirements set forth below may be satisfied by Bank being provided access to publicly filed information with the Securities and Exchange Commission satisfying such financial reporting requirements): With respect to each Borrower Party, (i) no later than one-hundred twenty (120) days after each Fiscal Year-End during the term of each Agreement, an income statement, balance sheet and statement of cash flows for the preceding Fiscal Year (on a Consolidated/Consolidating Basis) audited by an independent certified public account selected by Borrower and acceptable to Bank, and certified by such accountant to have been prepared in accordance with GAAP consistently applied, except for any inconsistencies explained in such certificate, provided that such Fiscal Year-End statements may be reviewed and not audited by a certified public accountant for Borrower if the sum of the Obligations are Ten Million Dollars ($10,000,000.00) or less. With respect to each Guarantor, if requested by Bank, (ii) no later than April 30 of each year during the Term of each Agreement, a personal financial statement and copies of tax returns when filed if such Guarantor is an individual; (iii) no later than sixty (60) days after each Quarter-End, such Borrower Party's quarterly financial report (including balance sheet and income statement on a Consolidated/Consolidating Basis) in each case, compared to the corresponding Quarter of the prior year), certified by such Borrower's Party's chief financial officer or such other responsible officer; (d) pay all fees of Bank when due, all expenses involved in perfecting Bank's Security Interest or the priority of Bank's Security Interest, and all other expenses of Bank related to each Agreement, or the protection and preservation of the Collateral, or the enforcement of any provision of each Agreement, or any of the other Transaction Documents, or amendments thereto; (e) permit Bank and its agents to have access to the Collateral upon reasonable advance notice to Borrower; (f) furnish to Bank, if Bank so requests, the contracts, bills of sale, receipted vouchers, and agreements, or any of them, under which Borrower claims title to the Equipment, (g) when requested so to do, make available for inspection and audit by duly authorized representatives of Bank any of its Records, and will furnish Bank any information regarding its business affairs and financial condition within a reasonable time after

written request therefor. Borrower shall reimburse Bank for all costs associated with such audit if the audit reveals a discrepancy in any financial report, statement or other document provided to Bank pursuant to each Agreement; (h) notify Bank thirty (30) days in advance of any change in the location of any of its places of business or of the establishment of any new place of business; (i) notify Bank immediately if it becomes aware of the occurrence of any Default, or if it becomes aware of any Material Adverse Change or any suit or proceeding involving it that might have a Material Adverse Effect; (j) pay or cause to be paid when due, and before the accrual of penalties thereon, all taxes, imposts, charges and other governmental charges of any kind, including personal property taxes and assessments levied or assessed against Borrower or the Collateral, and will provide Bank with receipted bills therefor if requested by Bank; and (k) keep the Collateral free from all Liens except the Bank's Security Interest.

      6.2     <u>Negative Covenants</u>. Borrower will not and will not allow a Borrower Party to (a) change its name, state of organization, or enter into any merger, consolidation, liquidation, reorganization or recapitalization, or dissolve; (b) without Bank's prior written consent, sell, assign, dispose, lease or otherwise transfer (including by operation of law) any Item or any of its interest in or rights under any Agreement or as to any Item; (c) not permit any Lien or grant a security interest in or otherwise permit, suffer or cause any Lien to exist or remain on any Item or the Collateral (except the Bank's Security Interest); (d) move the Equipment from the location identified in an Agreement, without the prior written approval from Bank, provided that Equipment which is mobile may be moved by Borrower in the normal operations of its customary and intended business practices, provided that such mobile Equipment returns the location described in the applicable Agreement at least (7) days of each month during the Term of such Agreement. Notwithstanding anything contained herein to the contrary, under no circumstances shall Borrower move an Item or allow an Item to be located outside of the continental United States; (e) record or attempt to record a termination statement under Article 9 of the UCC; (f) with respect to Titled Equipment, permit any Item to be located in a state or jurisdiction other than the state in which such Titled Equipment is currently titled for any continuous period of time that could subject such Titled Equipment to the titling or registration laws of such other state or jurisdiction; (g) use any Item of Equipment to store, transport, contain or deliver any Hazardous Materials or otherwise use the Equipment in violation of any Environmental Laws; (h) issue, redeem, purchase or retire any of its equity interests or grant or issue any warrant, right or option pertaining thereto or any other security convertible into any of the foregoing, nor otherwise permit any voluntary transfer, sale, redemption, retirement, or other change in the ownership of any equity interests of Borrower by the owners of such equity interests which results in a Change in Control of Borrower; (i) knowingly furnish Bank any certificate or other document that will contain any untrue statement of material fact or that will omit to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished; (j) affix or install any Item of Equipment to or in any real property in such a manner that may cause it to be a fixture, without the prior written approval of Bank and if so requested, Bank may require duly executed landlord's or mortgagee's waivers from any person claiming an interest in any real property or improvements on, or in, which any Item is located; (k) use the Equipment to transport persons for hire; and (l) declare or pay any dividends, or make any other payment or distribution if such payment or distribution would otherwise give rise to a Default.

      6.3     <u>Financial Covenant & Compliance Certificate</u>. Beginning with the Measurement Period ending on March 31, 2017, and as of the last day of each Measurement Period thereafter, Borrower Parties, on a consolidated basis, must maintain a Fixed Charge Coverage Ratio of at least 1.15 to 1.00 as of the last day of such Measurement Period. Borrower shall provide a compliance certificate in form and substance satisfactory to Bank executed by such Borrower's chief financial officer or such other responsible officer on the last day of the calendar quarter of each Measurement Period.

      6.4     <u>Insurance Covenants</u>. Borrower shall procure and maintain on or with respect to all Equipment at Borrower's sole cost and expense such insurance coverage in such amounts and with such responsible insurers, all as satisfactory to Bank (which may on reasonable notice require Borrower to change such form, amount or company), including: (a) comprehensive general liability insurance insuring against liability for property damage, death and bodily injury resulting from the transportation, ownership, possession, use, operation, performance, maintenance, storage, repair or any similar act related to the Equipment, with minimum limits of $1,000,000 per each single occurrence and $2,000,000 annual aggregate (or such other amounts as notified by Bank), with Bank and its successors and/or assigns named as additional insured; (b) all risk physical damage insurance against all risks of theft, loss or damage from every cause whatsoever in an amount not less than the greater of the full replacement cost of each Item of Equipment or the Casualty Value, with Bank and its successors and/or assigns named as lender loss payee; and (c) if reasonably requested by Bank, other or additional coverage. Borrower shall waive Borrower's rights and have its insurance carrier waive its right of subrogation against Bank for any and all loss or damage. All insurance coverages required by the Transaction Documents must be provided by insurance companies acceptable to the Bank that are rated at least an "A- IX" or better by Best's Insurance Guide. Each insurance policy must (i) permit the Bank to pay premiums at the Bank's discretion and (ii) as respects any third party liability claim brought against the Bank, obligate the insurer to defend Bank as an additional insured thereunder. Borrower shall ensure that each policy will not lapse, terminate, or be canceled, or be amended or modified to reduce limits or coverage terms unless and until Bank has received not less than thirty (30) days' prior written notice and stating that coverage shall not be invalidated against Bank or its assigns because of any violation of any condition or warranty contained in any policy or application therefor by Borrower or by reason of any action or inaction of Borrower. Borrower agrees to inform Bank immediately in writing of any notices from, or other communications with, any insurers that may in any way adversely affect the insurance policies being maintained pursuant to this Section. No insurance shall be subject to any co-insurance clause. Borrower agrees to deliver to Bank evidence of compliance with this Section satisfactory to Bank, including any requested copies of policies, certificates and endorsements, with premium receipts therefor, on or before the date of execution by Borrower of the applicable Agreement and thereafter within two (2) business days after Bank's request. Borrower shall pay all premiums on policies required hereunder as they become due and payable and promptly deliver to Bank evidence satisfactory to Bank of the timely payment thereof. In the event Borrower fails to provide, maintain, keep in force or deliver and furnish to Bank the insurance required by this Section, (without obligation and without waiving any Default) Bank may, at its sole option and at Borrower's sole cost and expenses, procure such insurance or single-interest insurance for such risks covering Bank's interest. Borrower acknowledges and agrees that such insurance may not cover Borrower interest in the Collateral, may be more expensive that insurance which Borrower could obtain on its own or provide the same level of coverage and Bank may make a profit on the provision thereof. Bank shall not be obligated to shop such insurance among available carries or place coverage with Bank's carrier and Borrower agrees that Bank is not a seller of insurance nor is Bank in the insurance business. Borrower will pay all premiums thereon promptly upon demand by Bank. Until such payment is made by Borrower, the amount of all such premiums shall be added to and become part of the Obligations. If any loss occurs at any time when Borrower has failed to perform Borrower's covenants and agreements in this Section, Bank shall nevertheless be entitled to the benefit of all insurance covering the loss and held by or for Borrower, to the same extent as if it had been made payable to Bank. Borrower appoints Bank as

Borrower's attorney in fact to cause the issuance of or an endorsement of any policy and to otherwise bring Borrower into compliance with the provisions of this Section and to make any claim for, receive payment for, and execute and endorse any documents, checks or other instruments in payment for loss, theft, or damage under any such insurance policy. Any insurance proceeds received by Bank will be applied, at Bank's option, to repair or replace the Equipment, or to pay Bank the Casualty Value. Bank shall be under no duty to ascertain the existence or examine any such policy or to advise Borrower in the event any such policy shall not comply with the requirements hereof. If any insurer which has issued a policy of, hazard, liability or other insurance required pursuant to an Agreement or any other Transaction Document becomes insolvent or the subject of any Bankruptcy, receivership or similar proceeding or if in Bank's opinion the financial responsibility of such insurer is or becomes inadequate, Borrower shall, in each instance promptly upon the request of Bank and at Borrower's expense, obtain and deliver to Bank a like policy (or, if and to the extent permitted by Bank, a certificate of insurance) issued by another insurer, which insurer and policy meet the requirements of each Agreement or such other Transaction Documents, as the case may be.

      6.5    <u>Covenants for Use and Maintenance of Equipment</u>. Borrower covenants and agrees that: (i) it will use the Equipment only for its originally-intended business purpose and it will not use the Equipment for consumer, personal, family, farming or household use; (ii) the Equipment will at all times be used, operated, maintained, serviced and repaired under and in compliance with all applicable Laws, its rated capacity, warranty provisions, requirements of insurance, operating manuals, rules, regulations and orders of any judicial, legislative or regulatory body having power to supervise or regulate the use, operation or maintenance of the Equipment, including license, permits and registration requirements applicable to the Equipment; (iii) Borrower shall, at its expense, cause qualified parties to make all modifications and improvements and maintenance to the Equipment required by law or otherwise, and will not make other modifications or improvements to the Equipment without the prior written consent of Bank; and (iv) without in any way limiting the foregoing, Borrower shall maintain and use the Equipment, at its sole cost and expense, in good and safe operating order, in like new condition excepting ordinary wear and tear. Borrower will give immediate oral and written notice to Bank of its receipt of any demand, notice, summons, complaint or legal proceeding relating to any Item including any violation of any law, regulation or standard covered by this section. Borrower acknowledges and agrees that any additional requirements as to the use and maintenance of the Equipment contained in the Agreement for such Equipment shall be in addition to, and not in limitation of this Section 6.4, except as expressly stated therein.

      6.6    <u>Risk of Loss, Casualty Value</u>. Borrower covenants and agrees that it shall bear the entire risk of an Event of Loss. No Event of Loss shall relieve Borrower from paying any Installment or Amount Due under an Agreement or performing any other obligation thereunder. Borrower shall immediately notify Bank of any insurance claim and of Total Loss or material damage upon an Item of Equipment, and inform Bank of the circumstances and extent of the Event of Loss and, at the option of Bank, Borrower shall (a) place such Equipment in good repair and working order so that the Equipment is of at least the same utility, value, useful life and marketability; or (b) replace such Equipment with like Equipment that is at least of the same utility, value, useful life and marketability, with clear title to the replacement Equipment in Borrower and not subject to any Lien other than the Bank's Security Interest; or (c) promptly pay to Bank an amount under the applicable Agreement equal to the Casualty Value. Bank may require that the Borrower perform option (c) hereof whether all or only a portion of the Equipment subject to an Agreement experiences an Event of Loss. Any proceeds received by Bank or Borrower as the result of an Event of Loss with respect to any Item (including insurance proceeds and proceeds of condemnation or requisition) shall be applied at Bank's election, in whole or in part, to (a) repair or replace such Item or any part thereof, or (b) satisfy any of any of Borrower's Obligations. Borrower shall also pay any costs and expenses (including Attorneys' Fees or the cost to engage an attorney even if no suit or claim is filed) incurred by Bank in connection with its exercise or protection of its rights and interests hereunder, including without limitation titling costs or other fees to effectively enforce Bank's interest in any item of Equipment. If no Event of Default has occurred and is continuing and no event or condition has occurred that with notice and/or passage of time could constitute an Event of Default, upon the payment of the Casualty Value with respect to any Agreement, and the payment of any and all other amounts due and payable to Bank, Bank shall release its security interest in such Items; provided that Borrower's Obligations with respect to taxes, indemnities and reimbursements hereunder shall survive with respect to all periods prior to such payment. If a rate for purposes of calculating a Discount Rate is not published in such publication-referenced hereinabove, such rate shall be taken from a reputable source selected by Bank. Notwithstanding the foregoing, if a table or addendum is attached to any Agreement that contains another method for establishing a Discount Rate, then such table or addendum shall control.

      6.7    <u>Inspection</u>. Borrower agrees to permit representatives of Bank from time to time to visit and inspect the Collateral, all Records related thereto, the premises upon which any of the Collateral is located, and any of the other offices and properties of Borrower; to examine the assets, books of account, and Records of Borrower; to discuss the affairs and finances of Borrower with and be advised as to the same by the officers thereof; and to verify the amount, quantity, value and condition of, or any other matter relating to, the Collateral, all at such times and intervals as Bank may desire.

      6.8    <u>Taxes</u>. (A) All Installments and Amounts Due payable by Company to Bank shall be made without setoff or counterclaim, and free and clear of, and without deduction or withholding for, or on account of, any present or future Taxes. If any such Taxes are imposed, Borrower will pay such additional amounts as may be necessary so that payment of principal of and interest under such Agreement, after withholding or deduction for or on account thereof, will not be less than any amount provided to be paid thereunder and, in any such case, Borrower will furnish to Bank certified copies of all tax receipts evidencing the payment of such amounts within thirty days after the date any such payment is due pursuant to applicable Laws. (B) Borrower covenants and agrees to (1) hold harmless and indemnify Bank for all Taxes; (2) properly file all reports and returns with respect to Taxes; (3) promptly pay all Taxes; and (4) upon Bank's request, furnish bank with evidence of compliance with this Section.

      6.9    <u>Further Assurances</u>. Borrower covenants and agrees that, at Borrower's cost and expense, upon request of Bank, Borrower shall duly execute and deliver, or cause to be duly executed and delivered, to Bank such further instruments and do and cause to be done such further acts as may be necessary or proper in the opinion of Bank or its counsel to carry out more effectively the provisions and purposes of each Agreement. Borrower further authorizes Bank or its designee to enter the Commencement Date and any other information that does not materially change the terms of any Agreement or this Master Agreement or other writing executed in connection with any Agreement, or any Item, including without limitation serial numbers.

6.10    Indemnity.  Borrower hereby agrees to defend, indemnify and hold Bank and its successors and/or assigns and any and all employees, agents, directors, partners, shareholders, officers, members of the foregoing and any assignee or secured party of Bank), harmless from and against all Actions and all Losses.  Borrower agrees to give Bank prompt notice of any claim or liability hereby indemnified. Borrower shall, at Bank's election, appear and defend any Action and/or pay the cost of the defense of any Action brought against Bank, either alone or in conjunction with others.  Borrower shall satisfy, pay and discharge all Losses that may be, incurred by, or recovered against, Bank in connection with any Action. The foregoing Indemnities are continuing indemnities and shall survive expiration or termination of each Agreement for any reason. This agreement of indemnity shall be a continuing agreement and shall survive payment of and termination of each Agreement.

7.    Default.

7.1    Events of Default.  The occurrence of any one or more of the following events shall constitute an Event of Default under each Agreement and all Transaction Documents: (a) Borrower shall fail to pay any Installment, Amount Due or any other amount owed to Bank under any Transaction Document within 5 days of when the same becomes due; (b) Borrower fails to perform or observe any of its obligations in Sections 6.1(b), 6.1(k), 6.2, 6.4, and 6.5, which failure shall constitute an immediate Event of Default; (c) any Borrower Party shall fail to pay, perform or observe any other obligation, condition or covenant to be observed or performed by it hereunder or under any of the Transaction Documents, which such failure shall remain uncured within 15 days, if such failure is capable of cure; (d) there shall occur any Event of Default as defined and provided under any other Transaction Document; (e) there shall occur any default or event of default (after the expiration of any applicable grace and cure period) under any agreement of any Borrower Party with Bank or any other Person and relating to the borrowing of money or the extension of credit; (f) the validity or enforceability of an Agreement or any of the other Transaction Document shall be contested by any Borrower Party, and/or any Borrower Party shall deny that it has any or further liability or obligation hereunder or thereunder; (g) assignment or attempted assignment by any Borrower Party of an Agreement, the Collaterals or any rights therein, (h) the death or dissolution of any Borrower Party, or any Change in Control; (i) any financial statement, representation, warranty or certificate made or furnished by any Borrower Party to Bank in connection with each Agreement, or as inducement to Bank to enter into such Agreement, or in any separate statement or document to be delivered hereunder to Bank, shall be false, incorrect, or incomplete when made; (j) any Borrower Party shall admit its inability to pay its debts or obligations as they mature, or shall make an assignment for the benefit of itself or any of its creditors; (k) proceedings in Bankruptcy, or under any other Laws for the relief of debtors, now or hereafter existing, shall be commenced by any Borrower Party, or shall be commenced against any Borrower Party and shall not be discharged within sixty (60) days of commencement; (l) any Borrower Party shall suffer final judgments for payment of money aggregating in excess of $200,000.00 and shall not discharge the same within a period of thirty (30) days unless, pending further proceedings (including appeals), execution has not been commenced or if commenced has been effectively stayed; (m) a receiver or trustee shall be appointed for any Borrower Party or for any substantial part of their assets, or any proceedings shall be instituted for the dissolution or the full or partial liquidation of any Borrower Party, and such receiver or trustee shall not be discharged within thirty (30) days of his appointment, or such proceedings shall not be discharged within sixty (60) days of its commencement, or any Borrower Party shall discontinue business or materially change the nature of its business; and (n) a judgment creditor of any Borrower Party shall obtain possession of any of the Collateral by any means, including, without limitation, levy, distraint, replevin or self-help. Provided that with respect to any of the foregoing, such Event of Default will be deemed to have occurred upon the occurrence of such event Without Notice if Bank is prevented from giving notice by Bankruptcy or other applicable Law.

7.2    No Advances After Default, Acceleration.  Upon the occurrence and during the continuance of any Default, and notwithstanding any provision in any Transaction Document to the contrary, Bank shall have the absolute right to refuse to make, and shall be under no obligation to make, any further Advances or enter into any Agreement. All Obligations shall, at the option of Bank, become immediately due and payable, Without Notice, upon the occurrence of an Event of Default without further action of any kind.

8.    General Remedies. Upon the occurrence of any Event of Default, Bank shall have, in addition to the rights and remedies given it by each Agreement and the other Transaction Documents, all those allowed by all applicable Laws as enacted in any Jurisdiction in which any Collateral may be located. Notwithstanding anything contained herein to the contrary, upon the occurrence of an Event of Default under Section 7 (i) – 7 (n) above, Borrower's Obligations shall automatically accelerate and Borrower shall immediately owe to Bank, Without Notice or demand from Bank, the Default Amount.

8.1    Bank's Additional Rights and Remedies.  Upon the occurrence of any Event of Default and except as may otherwise be prohibited or expressly provided for to the contrary under applicable Law, in addition to any rights or remedies Bank may otherwise have under each Agreement, any other Transaction Documents, or under applicable Laws and in equity, Bank shall have the right, Without Notice, to take any or all of the following actions at the same or different times: Without limiting the foregoing, Bank may at its election declare any or all Agreements to be in default and exercise any and all rights and remedies available to Bank, including the following rights and remedies: (i) proceed at law or in equity to enforce specifically Borrower's performance or to recover damages; (ii) require Borrower to immediately assemble, make available and if requested by Bank deliver the Equipment and Collateral (or, if so requested, any Items designated by Bank) to Bank at a time and place designated by Bank; (iii) enter any premises where any Item may be located and repossess, disable or take possession of the Equipment (and/or any attached or unattached parts) by self-help, summary proceedings or otherwise without liability for rent, costs, damages or otherwise; (iv) use Borrower's premises for storage without rent or liability; (v) sell, lease or otherwise dispose of the Equipment or such Items at private or public sale, whether the Equipment is present at such sale and with or without notice except to the extent required by applicable law, and if notice is required by law such requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the public sale or the time after which any other disposition is to be made; (vi) disable or keep idle all or part of the Equipment or such Items; (vii) declare all Agreements and all of Borrower's Obligations immediately due and payable including the Default Amount; or (viii) Bank may appoint or seek appointment of a receiver, Without Notice and without regard to the solvency of Borrower or the adequacy of the security, for the purpose of preserving the Collateral, preventing waste, and to protect all rights accruing to Bank by virtue of each Agreement and the other Transaction Documents. Borrower expressly acknowledges that each Agreement sets forth a reasonable amount and reasonable formula for calculation of liquidated damages in light of the anticipated harm caused by any default by Borrower hereunder and that such harm would otherwise be difficult to ascertain. In the event Borrower pays to Bank the Default Amount and any and all other amounts due and payable to Bank under each Agreement as a result of the Event of Default (in good, collected and indefeasible funds) prior to the date Bank enters into a contract or otherwise determines that it is obligated to a third party with respect to the

disposition of the Equipment, Bank shall release its security interest in the Equipment (without recourse, representation or warranty, "AS IS, WHERE IS AND WITH ALL FAULTS") and any right, title or interest Bank may have in such Equipment. Borrower acknowledges and agrees that Bank shall have no obligation, subject to any legal requirements of commercial reasonableness, to clean-up or otherwise prepare the Equipment or any Items for disposition; Bank may comply with any state or federal law requirements that Bank deems to be applicable or prudent to follow in connection with any such disposition; and any actions taken in connection therewith shall not be deemed to have adversely affected the commercial reasonableness of any such disposition. If Equipment delivered to or picked up by Bank contains goods or other property not constituting Equipment, Borrower agrees that Bank may take such other goods or property, provided that Bank makes reasonable efforts to make such goods or property available to Borrower after repossession upon Borrower's written request. If, after default, any Agreement is placed in the hands of an attorney, collection agent or other professional for collection of any Installment or Amount Due or enforcement of any other right or remedy of Bank, Borrower shall pay all Attorneys' Fees and associated costs and expenses. as to any default shall not be deemed a waiver, all waivers to be enforceable only if specifically provided in writing by Bank, and waiver of any default shall not be a waiver of any other or subsequent default. To the fullest extent permitted by applicable law, Borrower hereby waives any rights now or hereafter conferred by statute or otherwise that may require Bank to sell, lease or otherwise use any Equipment in mitigation of Bank's damages set forth in such Agreement or that may otherwise limit or modify any of Bank's rights or remedies.

8.2     Application of Proceeds. Except as otherwise expressly required to the contrary by applicable Law or any Transaction Document, the net cash proceeds resulting from the exercise of any of the rights and remedies of Bank under each Agreement, after deducting all charges, expenses, costs and Attorneys' Fees relating thereto, shall be applied by Bank to the payment of the Obligations, whether due or to become due, in such order and in such proportions as Bank may elect; and Borrower shall remain liable to Bank for any deficiency.

9.     ADDITIONAL TERMS.

9.1     Termination of Bank's Security Interest. Even if Borrower should pay all of the Obligations owing to Bank at any one time, Bank's Security Interest will continue to secure any amount Borrower should later owe Bank until the written termination or satisfaction has been executed by Bank (provided that Bank agrees to promptly provide a written termination or satisfaction agreement upon request of Borrower, provided that the Obligations have been paid and performed in full, Bank has no obligation to make any further Advances, and there is not existing any Default). Except as otherwise expressly provided, no termination of each Agreement shall in any way affect or impair the representations, warranties, agreements, covenants, obligations, duties and Obligations of Borrower Party or the powers, rights, and remedies of Bank under such Agreement with respect to any transaction or event occurring prior to such termination, all of which shall survive such termination. In no event shall Bank be obligated to terminate Bank's Security Interest or return or release the Collateral or any portion thereof to Borrower Party (a) until payment in full of the Obligations, or (b) if Bank is obligated to extend credit to Borrower.

9.2     Bank's Consent or Approval. Except where otherwise expressly provided in the Transaction Documents, in any instance where any matter or thing is required to be "satisfactory" to Bank or to Bank's "satisfaction", or in Bank's "discretion" where the approval, consent, or the exercise of Bank's judgment or discretion is required or permitted, the granting or denial of such approval or consent and the exercise of such judgment or discretion shall be (a) within the sole and absolute discretion of Bank; and (b) deemed to have been given only by a specific writing intended for the purpose given and executed by Bank.

9.3     Enforcement and Waiver by Bank. Bank shall have the right at all times to enforce the provisions of each Agreement and each of the other Transaction Documents in strict accordance with the terms hereof and thereof, notwithstanding any conduct or custom on the part of Bank in refraining from so doing at any time or times. The failure of Bank at any time or times to enforce its rights under such provisions, strictly in accordance with the same, shall not be construed as having created a custom in any way or manner contrary to specific provisions of each Agreement or as having in any way or manner modified or waived the same. All rights and remedies of Bank are cumulative and concurrent and the exercise of one right or remedy shall not be deemed a waiver or release of any other right or remedy.

9.4     No Representation, Assumption, or Duty. Nothing, including any acceptance of any document or instrument, shall be construed as a representation or warranty, express or implied, to any Person by Bank. Bank does not undertake to take any action to enforce any representation or warranty, to make any claim or to assist Borrower in enforcing or pursuing any representation, warranty or claim against any Supplier or other Person, provided that, Borrower agrees to use its reasonable best efforts to protect and enforce such rights so as to maintain the value and utility of the Equipment or any Item of Collateral. Any inspection or audit of the Collateral or the Records of Borrower, or the procuring of documents and financial and other information, by or on behalf of Bank shall be for Bank's protection only, and shall not constitute any assumption of responsibility by Bank with respect thereto or relieve Borrower of any of Borrower's obligations.

9.5     Expenses of Bank. Borrower will, on demand, reimburse Bank for all expenses incurred by Bank in connection with the preparation, administration, amendment, modification or enforcement of each Agreement and the other Transaction Documents and/or in the collection of any amounts owing from Borrower or any other Person to Bank under each Agreement or any other Transaction Document and, until so paid, the amount of such expenses shall be added to and become part of the Obligations.

9.6     Attorneys' Fees. If at any time or times hereafter Bank employs counsel to advise or provide other representation with respect to any Agreement, any Transaction Document, or any other agreement, document or instrument heretofore, now or hereafter executed by any Borrower Party and delivered to Bank with respect to the Obligations, or to commence, defend or intervene, file a petition, complaint, answer, motion or other pleadings or to take any other action in or with respect to any suit or proceeding relating to each Agreement, any Transaction Document, or any other agreement, instrument or document heretofore, now or hereafter executed by any Borrower Party and delivered to Bank with respect to the Obligations, or to represent Bank in any litigation with respect to the affairs of any Borrower Party, or to enforce any rights of Bank or obligations of any Borrower Party or any other Person which may be obligated to Bank by virtue of each Agreement, any Transaction Document, or any other agreement, document or instrument heretofore, now or hereafter delivered to Bank by or for the benefit of Borrower with respect to the Obligations,

or to collect from Borrower any amounts owing hereunder, then in any such event, all of the Attorneys' Fees incurred by Bank arising from such services and any expenses, costs and charges relating thereto shall constitute additional obligations of Borrower payable on demand and, until so paid, shall be added to and become part of the Obligations.

9.7    Exclusiveness.  Each Agreement and the other Transaction Documents are made for the sole benefit of Borrower Parties and Bank and its successors and assigns, and no other Person shall have any right of action hereunder.

9.8    Notices.  Any notices or consents required or permitted by an Agreement shall be in writing and shall be deemed delivered if delivered in person or if sent by certified mail, postage prepaid, return receipt requested, or by nationally-recognized overnight courier service (such as Federal Express), at the address of such Party on the first page of this Master Agreement, unless such address is changed by thirty (30) days prior written notice.

9.9    Waiver and Release by Borrower.  Unless and only to the extent as may be expressly limited or prohibited under applicable Law, Borrower (A) waives dishonor, notice and protest of all commercial paper at any time held by Bank on which Borrower is any way liable; (B) waives notice of acceleration and of intention to accelerate; (C) waives notice and opportunity to be heard, after acceleration, before exercise by Bank of the remedies of self-help, set-off, or of other summary procedures permitted by any applicable Laws or by any agreement with Borrower, and except where required hereby or by any applicable Laws which requirement cannot be waived, notice of any other action taken by Bank; and (D) releases Bank and their respective officers, attorneys, agents and employees from all claims for loss or damage caused by any act or omission on the part of any of them (except willful misconduct or gross negligence) in connection with the Obligations, the Transaction Documents.

9.10   Governing Law.  This Master Agreement and each Agreement thereunder is entered into and performable in Oakland County, Michigan, and the substantive Laws, without giving effect to principles of conflict of laws, of the United States and the State of Michigan shall govern the construction thereof and the other Transaction Documents, and the rights and remedies of the parties hereto and thereto, except to the extent that the location of any Collateral in a Jurisdiction other than Michigan requires that the perfection of Bank's Security Interest and the enforcement of certain of Bank's remedies with respect to the Collateral be governed by the Laws of such other Jurisdiction.

9.11   SUBMISSION TO JURISDICTION; WAIVERS. (A) BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY: (1) SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO EACH AGREEMENT, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF MICHIGAN, THE COURTS OF THE UNITED STATES OF AMERICA FOR THE EASTERN DISTRICT OF MICHIGAN, AND APPELLATE COURTS FROM ANY THEREOF; (2) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS, AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME; (3) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO BORROWER AT ITS ADDRESS SET FORTH ON THE FIRST PAGE HEREOF OR AT SUCH OTHER ADDRESS OF WHICH BANK SHALL HAVE BEEN NOTIFIED PURSUANT THERETO; AND (4) AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION. (B) BORROWER AND BANK HEREBY: (1) IRREVOCABLY AND UNCONDITIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING OR COUNTERCLAIM OF ANY TYPE AS TO ANY MATTER ARISING DIRECTLY OR INDIRECTLY OUT OF OR WITH RESPECT TO THIS MASTER AGREEMENT, EACH AGREEMENT, ANY OF THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THEREWITH; AND (2) AGREE THAT ANY OF THEM MAY FILE A COPY OF AN AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED FOR AGREEMENT BETWEEN THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY, AND THAT ANY DISPUTE OR CONTROVERSY OF ANY KIND WHATSOEVER BETWEEN THEM SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

9.12   Assignment.  Each Agreement shall inure to the benefit of, and shall be binding upon, the respective successors and permitted assigns of the parties hereto. Bank may assign this Master Agreement or any and all Agreements hereto, as well as all of its right, title and interest hereunder, to one or more Persons whatsoever Without Notice to or consent of Borrower.  In such event, Bank's assignee shall have all of the rights, but none of the obligations, of Bank hereunder and Borrower agrees that it will not assert against any assignee of Bank any defense, counterclaim or offset that Borrower may have against Bank with respect to any Agreement or any other matter.  Borrower acknowledges that any assignment or transfer by Bank, in whole or in part, does not materially change Borrower's duties or Obligations under any Agreement nor materially increase the burdens or risks imposed on Borrower.

9.13   Entire Agreement, Amendments, Severability.  Each Agreement and the documents executed and delivered pursuant hereto, constitute the entire agreement between the parties, and which may be amended only by a writing signed on behalf of each party. If any provision of this Master Agreement, each Agreement, or any of the other Transaction Documents shall be held invalid under any applicable Laws, such invalidity shall not affect any other provision of each Agreement or such other instrument or agreement that can be given effect without the invalid provision, and, to this end, the provisions hereof are severable.

9.14   Headings.  The section and paragraph headings hereof are inserted for convenience of reference only, and shall not alter, define, or be used in construing the text of such sections and paragraphs.

9.15    Sole Original and Counterparts.  This Master Agreement, each Agreement and all Transaction Documents executed in connection herewith may be executed and delivered in counterparts all of which shall constitute one and the same agreement. The exchange of signed copies by facsimile or electronic transmission (including pdf files) shall constitute effective execution and delivery and may be used in lieu of manually signed documents. Signatures of the parties transmitted by facsimile or electronic transmission qualify as authentic original signatures for purposes of enforcement thereof, including all matters of evidence and the "best evidence" rule. For purposes of perfection of a security interest in Chattel Paper under the UCC, only the counterpart of each Agreement that bears Bank's manually applied signature and marked "Sole Original" by Bank shall constitute the sole original counterpart of the original Chattel Paper for purposes of possession. No security interest in an Agreement can be perfected by possession of any other counterpart, each of which shall be deemed a duplicate original or copy for such purposes.

**IN WITNESS WHEREOF,** the parties hereto have caused this Master Agreement to be executed as of the date first set forth above.

**ATLAS SN LEASING, INC.**                                    **WOODFOREST NATIONAL BANK**

By: _____                            By: _____
Name: SRGTKO KRESIC                                          Name: Peggy A. Cummins
Its: PRESIDENT                                               Its: Senior Vice President

**EXHIBIT A**

The following terms shall have the meanings set forth below (such meanings to be equally applicable to the singular and plural forms thereof):

"<u>Actions</u>" shall mean all claims, allegations, demands, suits, actions, and legal proceedings incurred incident to, arising out of, or in any way connected with, each Agreement, any Item, or the transactions contemplated by this Master Agreement, whether civil, criminal, administrative, investigative or otherwise, including, without limitation, arbitration, mediation, bankruptcy and appeal and including any claims, demands, suits and legal proceedings arising out of (i) the actual or alleged manufacture, purchase, financing, ownership, delivery, rejection, non-delivery, possession, use, transportation, storage, operation, maintenance, repair, return or other disposition of the Equipment; (ii) the existence of latent and other defects (whether or not discoverable by Borrower or Bank); (iii) patent, trademark or copyright infringement; or (iv) any alleged or actual default by Borrower.

"<u>Advance</u>" means each extension of money or credit made or extended to or for the benefit of Borrower by Bank pursuant to this Master Agreement.

"<u>Affiliate</u>" means, as to any Person, each other Person that directly or indirectly through one or more intermediaries, controls, or is controlled by, or under common control with, such Person.

"<u>Agreement</u>" means a Schedule incorporating the terms and conditions of this Master Agreement, together with all modifications and amendments hereafter made.

"<u>Amounts Due</u>" means any payment or amount due hereunder or under any Agreement.

"<u>Anti-Terrorism Laws</u>" means any Laws relating to terrorism or money laundering, including Executive Order No. 13224 and the USA Patriot Act.

"<u>Attorneys' Fees</u>" means attorneys' fees actually incurred at ordinary and customary rates and shall include any and all attorneys' fees incurred by Bank (whether by its use of in-house counsel or otherwise) incident to, arising out of or in any way connected with Bank's interests in or defense of any Action or Bank's enforcement of its rights and interests under each Agreement, including attorneys' fees incurred by Bank to collect sums due, during any work-out, with respect to settlement negotiations, or in any bankruptcy proceeding (including attorneys' fees incurred in connection with any motion for relief from the automatic stay and any motion to assume or reject any Agreement).

"<u>Bank</u>" means Woodforest National Bank, a Texas bank.

"<u>Bank's Security Interest</u>" means the security interest granted to Bank by any Borrower Party pursuant to an Agreement.

"<u>Bankruptcy Law</u>" means Title 11, U.S. Code, or any similar Laws of any Jurisdiction for the relief of debtors, and "<u>Bankruptcy</u>" means the commencement of any case or other action for relief under Bankruptcy Law.

"<u>Borrower</u>" means the Borrower identified on the first page of this Master Agreement.

"<u>Borrower Parties</u>" means Borrower, Guarantors and any other Person that hereafter becomes a party to an Agreement or any other Transaction Document, and which Person is responsible in whole or in part for any of the Obligations.

"<u>Borrower's Interest</u>" means all the right, title and interest of Borrower of whatever kind, nature and description, whether now existing or hereafter arising.

"<u>Borrower's Representatives</u>" means an individual representative identified by Borrower to Bank, and any other person designated by Borrower as Borrower's Representatives.

"<u>Business Day</u>" means any day of the year, other than Saturday or Sunday, on which banks in the state of Michigan are not required or authorized to close.

"<u>Capital Expenditures</u>" means, with respect to Borrower for any period, the sum of all the expenditures (whether paid in cash, capitalized as an asset or accrued as a liability) made or incurred by Borrower during such period which, in accordance with GAAP, are or should be included in "capital expenditures" or similar items reflected on the statements of cash flows of Borrower, including under any Capital Leases.

"<u>Capital Lease</u>" means a capital lease or a lease which should be treated as a capital lease under GAAP.

"<u>Casualty Value</u>" means the following sum under the applicable Agreement: (i) the outstanding principal balance, (ii) all accrued and unpaid interest, (iii) any prepayment premium, and (iv) any other amounts necessary to provide Bank with all of the benefits of its bargain, all of the foregoing discounted at the Discount Rate.

"Change in Control" means a change in the ownership or other equitable interests and/or the Voting Power of Borrower as of the date of this Master Agreement, so that, after the change, the Person(s) (directly or indirectly) owns collectively less than one hundred percent (100.00%) of the outstanding equity interests and Voting Power of Borrower.

"Closing" means the time and place of actual execution and delivery of an Agreement, and except as waived by Bank, the other documents, instruments, and things required by Section 4.1 hereof.

"Closing Certificate" means a closing certificate of even date herewith in form and substance acceptable to Bank and signed by each Borrower Party.

"Collateral" means the Equipment of every kind, nature and description, wherever located, whether now owned or hereafter acquired when financed, whether in whole or in part, by Bank pursuant to an Agreement or designated as Collateral in any Transaction Document, including, but not limited to, the following: (i) all Accounts; Chattel Paper; Commercial Tort Claims; Choses in Action; Documents; General Intangibles; Instruments; Intellectual Property Rights; Inventory; Investment Property; Letter-of-Credit Rights; Payment Intangibles; Supporting Obligations; Rights as seller of Goods and rights to returned or repossessed Goods arising from or related to the Equipment; (ii) all existing and future leases and use agreements of the Equipment entered into by Borrower as lessor with other Persons as lessees, including without limitation the right to receive and collect all rentals and other monies, including security deposits, at any time payable under such leases and agreements; (iii) Borrower's rights in all purchase orders, warranty agreements, and other instruments and documents that relate to the acquisition of Equipment and (iv) all amounts that may be owing from time to time by Bank to Borrower in any capacity, including, without limitation, any balance or share belonging to Borrower, of any Deposit Accounts or other account with Bank; and All Records; and All interest, dividends, Proceeds, products, rents, royalties, issues and profits of any of the property described above.

"Commencement Date" shall mean the date specified in a Schedule as the first day of an Agreement.

"Consolidated/Consolidating Basis" means the consolidation of the assets, liabilities, income and losses, as applicable, of the Borrower Parties, exclusive of any Guarantor who is an individual, together with a separate statement of each of the foregoing for each Borrower Party whose assets, liabilities, income and losses are the subject of the consolidation.

"Default" means the occurrence of an event described in Section 7.1 hereof regardless of whether there shall have occurred any passage of time or giving of notice that would be necessary in order to constitute such event as an Event of Default.

"Default Amount" means the then outstanding principal balance under each Agreement; (bb) all accrued and unpaid interest; (cc) any prepayment premium set forth in each Agreement; and (dd) all costs and expenses incurred by Bank in any repossession, transportation, recovery, storage, refurbishing, advertising, repair, sale, lease, or other disposition of the Equipment or Bank's enforcement of its rights hereunder, including all Indemnified Losses and any brokers' or similar fees or any other fees, costs or expenses resulting from the Event of Default and all other amounts due under each Agreement.

"Default Costs" means all Indemnified Losses incurred by Bank by reason of a Default.

"Default Rate" means a variable per annum rate of interest equal to the lesser of (1) five percent (5%) in excess of the interest rate otherwise payable hereunder, or (2) the maximum rate allowed by applicable Laws.

"Discount Rate" means the lowest of the following: (A) the rate set forth for the Treasury Constant Maturities having the closest term to (but not longer than) the Term of the applicable Agreement, as set forth in the Federal Reserve Board H.15 Release (Selected Interest Rates) as of the Commencement Date applicable to such Schedule; or (B) the rate set forth for the Treasury Constant Maturities having the closest term to (but not longer than) the remaining Term of the applicable Schedule, as set forth in the Federal Reserve Board H.15 Release (Selected Interest Rates) as of the date of calculation of the Casualty Value applicable to such Schedule.

"EBITDA" means, with respect to an applicable Person for the applicable period, Net Income, plus the sum of (without duplication) Interest Expense, Income Tax Expense, Depreciation Expense and Amortization Expense.

"Environmental Laws" means all Laws of any Jurisdiction relating to the governance or protection of the environment, including without limitation, means, collectively, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 et seq.; the Toxic Substance Control Act, 15 U.S.C. § 2601 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 1802 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; or other applicable federal, state, or local laws, including any plans, rules, regulations, orders, or ordinances adopted, or other guidelines promulgated pursuant to the preceding laws or other similar laws, regulations, or ordinances now or hereafter in effect relating to hazardous materials disposal, generation, production, treatment, transportation, or storage or the protection of human health and the environment.

"Equipment" means all equipment, inventory, goods and all other personal property financed by Bank under an Agreement or items designated as Equipment in any Transaction Document, including all accessions, parts, replacements, substitutions, improvements, and accessories.

"Event of Default" means the occurrence of an event described in Section 7.1 hereof provided that there shall have occurred any passage of time or giving of notice that would be necessary in order to constitute such event as an Event of Default under Section 7.1.

"Event of Loss" means the loss, theft, damage to or destruction of any Item, or the Equipment (including any condemnation, seizure, or requisition of title or use from any cause whatsoever.

"Extraordinary Receipt" means any consideration received by or paid to or for the account of an applicable Person not in the ordinary course of business, including, without limitation, proceeds from dispositions of assets outside the ordinary course of business, tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof) and indemnity payments.

"Financing Statements" means the UCC-1 financing statements (including any amendments and continuations) and UCC-3 financing statements required under an Agreement.

"Fiscal Year" means a twelve-month period of time commencing on the first day of January.

"Fixed Charge Coverage Ratio" means, for any Measurement Period, the ratio of: (a) EBITDA minus (i) gains on sales of assets, minus (ii) extraordinary income or gains, minus (iii) Capital Expenditures (excluding, however, Capital Expenditures that were specifically funded by Funded Debt (including a Capital Lease), other than a revolving loan), minus (iv) Income Tax Expense, minus (v)cash dividends and distributions, minus (vi) loans, advances, or investments in or to any Person (other than loans or advances between Borrower Parties), plus (vii) losses on sales of assets; to (b) Fixed Charges.

"Fixed Charges" means the sum of the following for any Measurement Period (without duplication) on a consolidated basis: prepaid principal and interest payments for any Funded Debt, scheduled principal payments for any Funded Debt (regardless of whether the payments were made during the Measurement Period, including payments owing under Capital Leases),and Interest Expense.

"Funded Debt" means with respect to Borrower Parties, without duplication, at the date of determination, (a) all indebtedness for borrowed money, including, (b) all obligations for the deferred purchase price of property or services which evidence indebtedness, (c) all obligations evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired (whether or not the rights and remedies of the seller or lender under the agreement in the event of default are limited to repossession or sale of property), (e) all obligations as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (f) all obligations, contingent or otherwise, under acceptance, letter of credit and similar facilities, (g) all obligations to purchase, redeem, retire, defease or otherwise acquire for value any equity interests, (h) all net financial obligations in respect of Hedge Arrangements and all financial obligations under any similar contract, (i) all contingent obligations, (j) all Debt referred to in clauses (a) through (i) above secured by (or for which the holder of the Debt has an existing right, contingent or otherwise, to be secured by) any encumbrance on property (including accounts and contract rights), even though Borrower has not assumed or become liable for the payment of the Debt, (k) any other obligation arising under arrangements or agreements that, in substance, provide financing to Borrower.

"GAAP" means generally accepted principles of accounting as adopted in the United States of America applied on a consistent basis.

"Governing Body" means the board of directors of a Person or another individual or group exercising similar authority.

"Governmental Authority" means any nation or government and any political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory, or administrative functions pertaining thereto, which has or asserts jurisdiction over Bank, any Borrower Party, or any property of any of them.

"Guarantor" means a Person executing a Guaranty on behalf of Borrower in favor of Bank in connection with any Obligations of Borrower.

"Guaranty" means a Guaranty executed and delivered by a Guarantor in favor of Bank, together with all modifications and amendments hereafter made.

"Hazardous Materials" and "Hazardous Substances" means "hazardous materials" and "hazardous substances" as defined under any applicable Environmental Law.

"Income Tax Expense" means, for any Measurement Period, the aggregate of all federal, state and local taxes on income for the period, whether current or deferred, determined in accordance with GAAP.

"Interest Rate" means a rate of interest as set forth in each Agreement.

"Indemnified Losses" means all damages, dues, penalties, fines, costs (including costs of collection and court fees), amounts paid in settlement, taxes, losses, expenses, and fees (including Attorneys' Fees and expenses).

"Initial Advance" means the first Advance by Bank under this Master Agreement.

"Installment" means the periodic payment of principal and interest, as more fully set forth in an Agreement.

"Item" means an individual item of Equipment under an Agreement.

"Jurisdiction" means each and every nation or government or any political subdivision thereof.

"Laws" means each and all laws, treaties, ordinances, statutes, rules, regulations, orders, injunctions, writs or decrees of any Governmental Authority, or any court or similar entity, whether now in effect or hereafter enacted.

"Lien" means any pledge, encumbrance, charge, security interest, mortgage, assignment or other preferential arrangement of any nature whatsoever, including any conditional sale agreement or other title retention agreement.

"Losses" means any and all penalties, losses, liabilities (including the liability of Borrower or Bank for negligence, tort and strict liability), damages, costs, court costs, harms, judgments and any and all other expenses (including Attorneys' Fees, judgments and amounts paid in settlement and other legal and non-legal expenses incurred investigating or defending any Action) incurred incident to, arising out of or in any way connected with any Actions, any Agreement, any Items, or any other instrument, document or agreement executed in connection with or contemplated by any of the foregoing.

"Master Agreement" means this Master Equipment Finance Agreement.

"Material Adverse Change" means the occurrence of an event giving rise to a Material Adverse Effect.

"Material Adverse Effect" means, as determined by Bank, a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance, properties or prospects of any Borrower Party after the date of this Master Agreement; (b) the rights and remedies of Bank under any Transaction Document; (c) the ability of any Borrower Party to perform its Obligations under any Transaction Document to which it is or is to be a party; or (d) the priority of Bank's Security Interest.



"Measurement Period" means a twelve (12) month period of time ending 3/31/17 and a rolling twelve (12) month period ending on the last day of each calendar month quarter of such Measurement Period thereafter.

"Net Income" means, for any period, Borrower Parties' net income for the period, as determined in accordance with GAAP.

"Net Proceeds" shall mean the after-tax amount received by Bank in immediately-available funds not subject to recapture, rebate or divestiture from such purchaser; or (ii) in the case of a purchase of the Equipment which Bank finances pursuant to a lease intended as security or other equipment finance arrangement or in the case of a disposition pursuant to a true lease (any such leases or finance agreements being referred to hereinafter as a "Replacement Agreement"), an amount equal to the sum of all non-cancellable periodic payments and any purchase election, purchase requirement or balloon payment set forth in the Replacement Agreement, discounted to present value at the implicit rate of interest of the Replacement Agreement as determined by Bank.

"Obligations" means the obligations (including obligations of performance) and liabilities of any Borrower Party to Bank of every kind and description whatsoever, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter incurred, contracted or arising, or acquired by Bank from any source, joint or several, liquidated or unliquidated, regardless of how they arise or by what agreement or instrument they may be evidenced or whether they are evidenced by any agreement or instrument, and whether incurred as maker, endorser, surety, guarantor, general partner, drawer, tort-feasor, indemnitor, account party with respect to a letter of credit or otherwise, including, without limitation, obligations incurred pursuant to and/or in connection with any Transaction Document, and any and all extensions and renewals of any of the same, including, but not limited to, the obligation: (a) To pay the principal of and interest on each Agreement in accordance with the respective terms thereof and/or hereof, including any and all extensions, modifications, and renewals thereof and substitutions therefor; (b) To repay to Bank all amounts advanced by Bank hereunder, under any of the Transaction Documents or otherwise on behalf of Borrower, including, but without limitation, future advances and advances for principal or interest payments to prior secured parties, or lienors, or for taxes, levies, insurance, rent, or repairs to or maintenance or storage of, any of the Collateral; and (c) To reimburse Bank, on demand, for all of Bank's expenses and costs, including Attorneys' Fees and expenses, in connection with the preparation, administration, amendment, modification, or enforcement of each Agreement and the other Transaction Documents, including, without limitation, any proceeding brought or threatened to enforce payment of any of the obligations referred to in the foregoing paragraphs (a), (b) and (c).

"Organizational Documents" means (i) the articles of incorporation and the bylaws of a corporation, (ii) the partnership agreement and any statement of partnership of a general partnership, (iii) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (iv) the articles of organization and the operating agreement of a limited liability company, (v) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person, and (vi) any amendment to any of the foregoing.

"Payment Due Date" means the Payment Due Date as set forth in an Agreement.

"Person" means any individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture, court or Governmental Authority.

"Place for Payment" means a place for payment as from time to time designated by Bank, which place for payment currently is at the address of Bank as provided for with respect to notices.

"<u>Quarter</u>" means a period of time of three consecutive calendar months.

"<u>Quarter-End</u>" means the last day of each of March, June, September and December.

"<u>Records</u>" means correspondence, memoranda, tapes, discs, microfilm, microfiche, papers, books and other documents, or transcribed information of any type, whether expressed in ordinary or machine language, and all filing cabinets and other containers in which any of the foregoing is stored or maintained.

"<u>Schedule</u>" means an Equipment Finance Schedule to this Master Agreement executed by Borrower in favor of Bank, in the form attached hereto as **Exhibit B.**

"<u>Solvent</u>" and "<u>Solvency</u>" mean, with respect to any Person on a particular date, that on such date (a) the fair value of the property and assets of such Person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person, (b) the present salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"<u>Taxes</u>" shall mean all license, title, recording and registration fees and any and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, fees and assessments now or hereafter imposed by any foreign, federal, state or local governmental body, agency, or any other taxing authority upon the Equipment or payable in connection with the execution and delivery of each Agreement, upon the purchase, ownership, delivery, leasing, possession, use or operation thereof or otherwise in connection with any Agreement, Item of Equipment, the Collateral or other charges of whatever nature, imposed by any Governmental Authority.

"<u>Term</u>" means the period of time, under an Agreement, from the Commencement Date until Borrower satisfies all of its Obligations under, related to or with respect to an Agreement.

"<u>Third Party</u>" means any Person not a party to an Agreement.

"<u>Titled Equipment</u>" means an Item, which is subject to a Jurisdiction's certificate of title law.

"<u>Transaction Documents</u>" means this Master Agreement, each Agreement executed in connection therewith, the Guaranty (if applicable), the Closing Certificates, and any and all other documents or instruments of any kind heretofore, contemporaneously herewith or hereafter executed or delivered in connection with, or evidencing, securing, guaranteeing or relating to, the Equipment, an Agreement or any Borrower Party, together with any and all extensions, revisions, modifications or amendments at any time made to any of the foregoing.

"<u>Total Loss</u>" shall be mean upon: (1) the actual or constructive total loss of any item of the Equipment, (2) the loss, disappearance, theft or destruction of any Item of the Equipment, or damage to any item of the Equipment that is uneconomical to repair or renders it unfit for normal use, or (3) the condemnation, confiscation, requisition, seizure, forfeiture or other taking of title to or use of any item of the Equipment or the imposition of any Lien thereon by any governmental authority.

"<u>Voting Power</u>" means, with respect to any Person, the right to vote for the election of the Governing Body of such Person under ordinary circumstances.

"<u>Without Notice</u>" means without demand of performance, sending of any invoice or other demand, advertisement, or notice of any kind to or upon the applicable Person, except as may be expressly required by applicable Law.

<u>Accounting Terms</u>. Accounting terms used and not otherwise defined in herein have the meanings determined by, and all calculations with respect to accounting or financial matters unless otherwise provided herein shall be computed in accordance with, GAAP.

<u>UCC Terms</u>. As used herein, "Accounts", "Chattel Paper", "Commercial Tort Claims", "Consumer Transaction", "Deposit Accounts", "Documents", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Rights", "Payment Intangible", "Proceeds", "Supplier", "Support Obligations", and other terms not specifically defined herein shall have the same respective meanings as are given to those terms in the Uniform Commercial Code as presently adopted and in effect in the State of Michigan (except in cases and with respect to Collateral when the perfection, the effect of perfection or nonperfection, and the priority of a Lien in the Collateral is governed by another Jurisdiction, in which case such capitalized words and phrases shall have the meanings attributed to those terms under such other Jurisdiction).

<u>Construction of Terms/Time Periods</u>. Whenever used, the singular number shall include the plural and the plural the singular, pronouns of one gender shall include all genders, and use of the terms "herein", "hereof", and "hereunder" shall be deemed to be references to an Agreement in its entirety unless otherwise specifically provided. For purposes of computation of periods of time hereunder, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding", and the word "through" means "through and including".

**EXHIBIT B**

**FORM OF SCHEDULE**

## GUARANTY

This Guaranty is made as of ~~January~~ *Feb 9*, 2017 by Sretko Krsic (the "**Guarantor**") in favor of **WOODFOREST NATIONAL BANK**, a national banking association, with an address of 28001 Cabot Drive, Suite 240, Novi, MI 48377 (the "**Bank**"), In consideration of any credit or other financial accommodation now or hereafter extended or made to Atlas SN Leasing Inc. (the "**Borrower**"), by Bank and for other valuable consideration, the Guarantor, unconditionally guarantees to Bank the full and prompt payment and performance when due of any and all Indebtedness of the Borrower to Bank. The term "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, performance, obligations and liabilities of Borrower, or any of them heretofore, now or hereafter made, incurred or created, whether direct or indirect, voluntary or involuntary and however arising, whether due or to become due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any loan agreement, note, lease, security agreement, swap, derivative, foreign exchange, hedge, deposit, treasury management or other similar transaction or arrangement, and all modifications, extensions and renewals thereof, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter become unenforceable. This Guaranty is a guaranty of payment and not collection.

**1. CONTINUING LIABILITY; SUCCESSIVE TRANSACTIONS; REVOCATION; OBLIGATION UNDER OTHER GUARANTIES.** This is a continuing guaranty and all rights, powers and remedies hereunder shall apply to all past, present and future Indebtedness of the Borrower to Bank, including that arising under successive transactions which shall either continue the Indebtedness, increase or decrease it, or from time to time create new Indebtedness after all or any prior Indebtedness has been satisfied, and notwithstanding the death, incapacity, dissolution, liquidation or bankruptcy of the Borrower or Guarantor or any other event or proceeding affecting the Borrower or Guarantor. This Guaranty shall not apply to any new Indebtedness created more than fifteen (15) days after actual receipt by Bank of written notice of its termination as to such new Indebtedness; provided however, that loans, advances, leases or other financial accommodations made by Bank to, for or with the Borrower after termination under commitments existing prior to receipt by Bank of such termination, and extensions, renewals or modifications, of any kind, of Indebtedness incurred by the Borrower or committed by Bank prior to receipt by Bank of such termination, shall not be considered new Indebtedness. Any such notice must be sent to Bank by registered U.S. mail, postage prepaid, addressed to its office at the top of this page, or at such other address as Bank shall from time to time designate. Termination of this Guaranty by any single Guarantor will not affect the existing and continuing obligations of any other Guarantor hereunder. The obligations of Guarantor hereunder shall be in addition to any obligations of Guarantor under any other guaranties of any liabilities or obligations of the Borrower or any other persons heretofore or hereafter given to Bank unless said other guaranties are expressly modified or revoked in writing; and this Guaranty shall not, unless expressly herein provided, affect or invalidate any such other guaranties.

**2. OBLIGATIONS JOINT AND SEVERAL; SEPARATE ACTIONS; WAIVER OF STATUTE OF LIMITATIONS; REINSTATEMENT OF LIABILITY.** The obligations hereunder are joint and several and independent of the obligations of Borrower or any other Guarantor and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against the Borrower, any other Guarantor, or any other person, or whether the Borrower, any other Guarantor or any other person is joined in any such action or actions. If more than one person or entity has signed this Guaranty, the obligations of each Guarantor shall be joint and several. Guarantor acknowledges that this Guaranty is absolute and unconditional, there are no conditions precedents to the effectiveness of this Guaranty, and this Guaranty is in full force and effect and is binding on Guarantor as of the date written below, regardless of whether Bank obtains collateral or any guaranties from others or takes any other action contemplated by Guarantor. Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof. The liability of Guarantor hereunder shall be reinstated and revived and the rights of Bank shall continue if and to the extent for any reason any amount at any time paid on account of any Indebtedness guaranteed hereby is rescinded, avoided or must otherwise be restored by Bank, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid. The determination as to whether any amount so paid must be rescinded or restored shall be made by Bank in its sole discretion; provided however, that if Bank chooses to contest any such matter at the request of Guarantor, Guarantor agrees to indemnify and hold Bank harmless from and against all costs and expenses, including reasonable attorneys' fees, expended or incurred by Bank in connection therewith, including without limitation, in any litigation with respect thereto.

**3. AUTHORIZATIONS TO BANK.** Guarantor authorizes Bank either before or after revocation hereof, without notice to or demand on Guarantor, and without affecting Guarantor's liability hereunder, from time to time to: (a) alter, compromise, renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; (b) exchange, enforce,

**EXHIBIT**

**2**

tabbies

waive, subordinate or release any security for the payment of this Guaranty or the Indebtedness or any portion thereof; (c) apply such security and direct the order or manner of sale thereof, including without limitation, a non-judicial sale permitted by the terms of the controlling security agreement, mortgage, or deed of trust, as Bank in its discretion may determine; (d) release or substitute any one or more of the endorsers or any other guarantors of the Indebtedness, or any portion thereof, or any other party thereto; and (e) apply payments received by Bank from the Borrower to any Indebtedness of the Borrower to Bank, in such order as Bank shall determine in its sole discretion, whether or not such Indebtedness is covered by this Guaranty, and Guarantor hereby waives any provision of law regarding application of payments which specifies otherwise. Bank may without notice assign this Guaranty in whole or in part. Upon Bank's request, Guarantor agrees to provide to Bank copies of Guarantor's financial statements.

**4. REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Bank that: (a) this Guaranty is executed at Borrower's request; (b) Guarantor shall not, without Bank's prior written consent, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or a substantial or material part of Guarantor's assets other than in the ordinary course of Guarantor's business; (c) Bank has made no representation to Guarantor as to the creditworthiness of the Borrower; (d) if the Guarantor is a partnership, corporation, limited liability company or other legal entity, the execution, delivery and performance of this Guaranty has been duly authorized by all necessary action on the part of the Guarantor and will not violate any provision of the Guarantor's governing documents; and the person signing this Guaranty on behalf of the Guarantor is duly authorized.

**5. GUARANTOR'S WAIVERS.**(a) Guarantor waives any right to require Bank to: (i) make demand upon, assert claims against or proceed against the Borrower or any other person; (ii) marshal assets or proceed against or exhaust any security held from the Borrower or any other person; (iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from the Borrower or any other person; (iv) take any other action or pursue any other remedy in Bank's power; or (v) make any presentment or demand for performance, or give any notice of extensions, modifications or renewals of Indebtedness, any new transactions between Borrower and Bank and/or any other Guarantor, presentment, nonperformance, protest, notice of default,, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by Bank as security for or which constitute in whole or in part the Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness.

(b) Guarantor waives any defense to its obligations hereunder based upon or arising by reason of: (i) any disability or other defense of the Borrower or any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of the Borrower or any other person; (iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf of the Borrower which is a corporation, partnership or other type of entity, or any defect in the formation of any such Borrower; (iv) the application by the Borrower of the proceeds of any Indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Bank or Guarantor; (v) any act or omission by Bank which directly or indirectly results in or aids the discharge of the Borrower or any portion of the Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against the Borrower; (vi) any impairment of the value of any interest in any security for the Indebtedness or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) or any requirement that Bank give any notice of acceptance of this Guaranty. Until all Indebtedness shall have been paid in full, Guarantor shall have no right of subrogation, and Guarantor waives any right to enforce any remedy which Bank now has or may hereafter have against the Borrower or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by Bank. Guarantor further waives all rights and defenses Guarantor may have arising out of (A) any election of remedies by Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against the Borrower for reimbursement, or (B) any loss of rights Guarantor may suffer by reason of any rights, powers or remedies of the Borrower in connection with any anti-deficiency laws or any other laws limiting, qualifying or discharging Borrower's Indebtedness, whether by operation of law or otherwise, including any rights Guarantor may have to a fair market value hearing to determine the size of a deficiency following any foreclosure sale or other disposition of any real property security for any portion of the Indebtedness.

**6. REMEDIES; NO WAIVER.** All rights, powers and remedies of Bank hereunder are cumulative. No delay, failure or discontinuance of Bank in exercising any right, power or remedy hereunder shall affect or operate as a waiver of such right, power or remedy; nor shall any single or partial exercise of any such right, power or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver,

permit, consent or approval of any kind by Bank of any breach of this Guaranty, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing.

**7. COSTS, EXPENSES AND ATTORNEYS' FEES.** Guarantor shall pay to Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by Bank in connection with the enforcement of any of Bank's rights, powers or remedies and/or the collection of any amounts which become due to Bank under this Guaranty or to enforce or collect any of the Indebtedness, and the prosecution or defense of any action in any way related to this Guaranty.

**8. SUCCESSORS; ASSIGNMENT.** This Guaranty shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties; provided however, that Guarantor may not assign or transfer any of its interests or rights hereunder without Bank's prior written consent. Guarantor acknowledges that Bank has the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, any Indebtedness of Borrower to Bank and any obligations with respect thereto, including this Guaranty. In connection therewith, Bank may disclose all documents and information which Bank now has or hereafter acquires relating to Guarantor and/or this Guaranty, whether furnished by Borrower, Guarantor or otherwise. Guarantor further agrees that Bank may disclose such documents and information to Borrower.

**9. FINANCIAL REPORTING.** So long as Guarantor has any obligations under or pursuant to this Guaranty, Guarantor will furnish to Bank as soon as the same become available, but in any event: (i) no later than April 30 of each year, a personal financial statement and copies of tax returns when filed if such Guarantor is an individual; (ii) no later than forty-five days after each Fiscal Year-End, a management-prepared income statement, balance sheet and statement of cash flows for the preceding Fiscal Year, all in reasonable detail, including all supporting schedules and comments, if such Guarantor is corporate entity. Guarantor agree to also deliver or cause to be delivered such other information as Bank may reasonably request from time to time, including without limitation other financials statements and information pertaining to Guarantor.

**10. MISCELLANEOUS.** This Guaranty may be amended or modified only in writing signed by Bank and Guarantor. In all cases where there is more than one Borrower named herein, the word "Borrower" shall mean all or any one or more of them as the context requires. If any waiver or other provision of this Guaranty shall be held to be prohibited by or invalid under applicable public policy or law, such waiver or other provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such waiver or other provision or any remaining provisions of this Guaranty. Bank may in its sole discretion, accept a photocopy, electronically transmitted facsimile or other reproduction of this guaranty (a "Counterpart") as the binding and effective record of this Guaranty whether or not an ink signed copy hereof is also received by Bank from the undersigned, provided, however, that if Bank accepts a Counterpart as the binding and effective record hereof, the Counterpart acknowledged in writing by Bank shall constitute the record hereof. The Guarantor agrees that such Counterpart received by Bank, shall, when acknowledged in writing by Bank, constitute an original document for the purposes of establishing the provisions thereof and shall be legally admissible under the best evidence rule and binding on and enforceable against the Guarantor. If Bank accepts a Counterpart as the binding and effective record hereof only such Counterpart acknowledged in writing by Bank shall be marked "Original" and a security interest may only be created in the Guaranty that bears Bank's ink signed acknowledgement and is marked "Original".

*11.* **GOVERNING LAW.** This Guaranty is entered into and performable in Oakland County, Michigan, and the substantive laws, without giving effect to principles of conflict of laws, of the United States and the State of Michigan shall govern the construction hereof, and the rights and remedies of the parties hereto. Guarantor and Bank consent that any legal action or proceeding arising hereunder shall be brought in the State and Federal courts in Oakland County, Michigan, and assent and submit to the personal jurisdiction of any such courts in any such action or proceeding.

**12. JURY WAIVERS. GUARANTOR HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR IN CONNECTION WITH THE TRANSACTIONS RELATED HERETO OR THERETO OR CONTEMPLATED HEREBY OR THEREBY OR THE EXERCISE OF ANY RIGHTS AND REMEDIES HEREUNDER OR THEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. GUARANTOR AGREES THAT BANK MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED AGREEMENT OF GUARANTOR WITH BANK**

IRREVOCABLY TO WAIVE TRIAL BY JURY, AND THAT ANY DISPUTE OR CONTROVERSY WHATSOEVER BETWEEN THEM SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

.

**GUARANTOR:**

By: _____

Name: ___Sretko Krsic_____

Date: ___9/2/2017_____

2/9/17

**WITNESS:**

By: _____

Name: ___Siniso. Drageljcvic___

Date: _____02/09/17_____

## GUARANTY

This Guaranty is made as of ~~January~~ *fcs* 9, 2017 by Sladana Krsic (the **"Guarantor"**) in favor of **WOODFOREST NATIONAL BANK**, a national banking association, with an address of 28001 Cabot Drive, Suite 240, Novi, MI 48377 (the **"Bank"**), In consideration of any credit or other financial accommodation now or hereafter extended or made to Atlas SN Leasing Inc. (the **"Borrower"**), by Bank and for other valuable consideration, the Guarantor, unconditionally guarantees to Bank the full and prompt payment and performance when due of any and all Indebtedness of the Borrower to Bank. The term "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, performance, obligations and liabilities of Borrower, or any of them heretofore, now or hereafter made, incurred or created, whether direct or indirect, voluntary or involuntary and however arising, whether due or to become due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any loan agreement, note, lease, security agreement, swap, derivative, foreign exchange, hedge, deposit, treasury management or other similar transaction or arrangement, and all modifications, extensions and renewals thereof, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter become unenforceable. This Guaranty is a guaranty of payment and not collection.

**1. CONTINUING LIABILITY; SUCCESSIVE TRANSACTIONS; REVOCATION; OBLIGATION UNDER OTHER GUARANTIES.** This is a continuing guaranty and all rights, powers and remedies hereunder shall apply to all past, present and future Indebtedness of the Borrower to Bank, including that arising under successive transactions which shall either continue the Indebtedness, increase or decrease it, or from time to time create new Indebtedness after all or any prior Indebtedness has been satisfied, and notwithstanding the death, incapacity, dissolution, liquidation or bankruptcy of the Borrower or Guarantor or any other event or proceeding affecting the Borrower or Guarantor. This Guaranty shall not apply to any new Indebtedness created more than fifteen (15) days after actual receipt by Bank of written notice of its termination as to such new Indebtedness; provided however, that loans, advances, leases or other financial accommodations made by Bank to, for or with the Borrower after termination under commitments existing prior to receipt by Bank of such termination, and extensions, renewals or modifications, of any kind, of Indebtedness incurred by the Borrower or committed by Bank prior to receipt by Bank of such termination, shall not be considered new Indebtedness. Any such notice must be sent to Bank by registered U.S. mail, postage prepaid, addressed to its office at the top of this page, or at such other address as Bank shall from time to time designate. Termination of this Guaranty by any single Guarantor will not affect the existing and continuing obligations of any other Guarantor hereunder. The obligations of Guarantor hereunder shall be in addition to any obligations of Guarantor under any other guaranties of any liabilities or obligations of the Borrower or any other persons heretofore or hereafter given to Bank unless said other guaranties are expressly modified or revoked in writing; and this Guaranty shall not, unless expressly herein provided, affect or invalidate any such other guaranties.

**2. OBLIGATIONS JOINT AND SEVERAL; SEPARATE ACTIONS; WAIVER OF STATUTE OF LIMITATIONS; REINSTATEMENT OF LIABILITY.** The obligations hereunder are joint and several and independent of the obligations of Borrower or any other Guarantor and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against the Borrower, any other Guarantor, or any other person, or whether the Borrower, any other Guarantor or any other person is joined in any such action or actions. If more than one person or entity has signed this Guaranty, the obligations of each Guarantor shall be joint and several. Guarantor acknowledges that this Guaranty is absolute and unconditional, there are no conditions precedents to the effectiveness of this Guaranty, and this Guaranty is in full force and effect and is binding on Guarantor as of the date written below, regardless of whether Bank obtains collateral or any guaranties from others or takes any other action contemplated by Guarantor. Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof. The liability of Guarantor hereunder shall be reinstated and revived and the rights of Bank shall continue if and to the extent for any reason any amount at any time paid on account of any Indebtedness guaranteed hereby is rescinded, avoided or must otherwise be restored by Bank, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid. The determination as to whether any amount so paid must be rescinded or restored shall be made by Bank in its sole discretion; provided however, that if Bank chooses to contest any such matter at the request of Guarantor, Guarantor agrees to indemnify and hold Bank harmless from and against all costs and expenses, including reasonable attorneys' fees, expended or incurred by Bank in connection therewith, including without limitation, in any litigation with respect thereto.

**3. AUTHORIZATIONS TO BANK.** Guarantor authorizes Bank either before or after revocation hereof, without notice to or demand on Guarantor, and without affecting Guarantor's liability hereunder, from time to time to: (a) alter, compromise, renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; (b) exchange, enforce,

EXHIBIT

3

waive, subordinate or release any security for the payment of this Guaranty or the Indebtedness or any portion thereof; (c) apply such security and direct the order or manner of sale thereof, including without limitation, a non-judicial sale permitted by the terms of the controlling security agreement, mortgage, or deed of trust, as Bank in its discretion may determine; (d) release or substitute any one or more of the endorsers or any other guarantors of the Indebtedness, or any portion thereof, or any other party thereto; and (e) apply payments received by Bank from the Borrower to any Indebtedness of the Borrower to Bank, in such order as Bank shall determine in its sole discretion, whether or not such Indebtedness is covered by this Guaranty, and Guarantor hereby waives any provision of law regarding application of payments which specifies otherwise. Bank may without notice assign this Guaranty in whole or in part. Upon Bank's request, Guarantor agrees to provide to Bank copies of Guarantor's financial statements.

**4. REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Bank that: (a) this Guaranty is executed at Borrower's request; (b) Guarantor shall not, without Bank's prior written consent, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or a substantial or material part of Guarantor's assets other than in the ordinary course of Guarantor's business; (c) Bank has made no representation to Guarantor as to the creditworthiness of the Borrower; (d) if the Guarantor is a partnership, corporation, limited liability company or other legal entity, the execution, delivery and performance of this Guaranty has been duly authorized by all necessary action on the part of the Guarantor and will not violate any provision of the Guarantor's governing documents; and the person signing this Guaranty on behalf of the Guarantor is duly authorized.

**5. GUARANTOR'S WAIVERS.**(a) Guarantor waives any right to require Bank to: (i) make demand upon, assert claims against or proceed against the Borrower or any other person; (ii) marshal assets or proceed against or exhaust any security held from the Borrower or any other person; (iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from the Borrower or any other person; (iv) take any other action or pursue any other remedy in Bank's power; or (v) make any presentment or demand for performance, or give any notice of extensions, modifications or renewals of Indebtedness, any new transactions between Borrower and Bank and/or any other Guarantor, presentment, nonperformance, protest, notice of default,, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by Bank as security for or which constitute in whole or in part the Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness.

(b) Guarantor waives any defense to its obligations hereunder based upon or arising by reason of: (i) any disability or other defense of the Borrower or any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of the Borrower or any other person; (iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf of the Borrower which is a corporation, partnership or other type of entity, or any defect in the formation of any such Borrower; (iv) the application by the Borrower of the proceeds of any Indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Bank or Guarantor; (v) any act or omission by Bank which directly or indirectly results in or aids the discharge of the Borrower or any portion of the Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against the Borrower; (vi) any impairment of the value of any interest in any security for the Indebtedness or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) or any requirement that Bank give any notice of acceptance of this Guaranty. Until all Indebtedness shall have been paid in full, Guarantor shall have no right of subrogation, and Guarantor waives any right to enforce any remedy which Bank now has or may hereafter have against the Borrower or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by Bank. Guarantor further waives all rights and defenses Guarantor may have arising out of (A) any election of remedies by Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against the Borrower for reimbursement, or (B) any loss of rights Guarantor may suffer by reason of any rights, powers or remedies of the Borrower in connection with any anti-deficiency laws or any other laws limiting, qualifying or discharging Borrower's Indebtedness, whether by operation of law or otherwise, including any rights Guarantor may have to a fair market value hearing to determine the size of a deficiency following any foreclosure sale or other disposition of any real property security for any portion of the Indebtedness.

**6. REMEDIES; NO WAIVER.** All rights, powers and remedies of Bank hereunder are cumulative. No delay, failure or discontinuance of Bank in exercising any right, power or remedy hereunder shall affect or operate as a waiver of such right, power or remedy; nor shall any single or partial exercise of any such right, power or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver,

permit, consent or approval of any kind by Bank of any breach of this Guaranty, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing.

7. **COSTS, EXPENSES AND ATTORNEYS' FEES.** Guarantor shall pay to Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by Bank in connection with the enforcement of any of Bank's rights, powers or remedies and/or the collection of any amounts which become due to Bank under this Guaranty or to enforce or collect any of the Indebtedness, and the prosecution or defense of any action in any way related to this Guaranty.

8. **SUCCESSORS; ASSIGNMENT.** This Guaranty shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties; provided however, that Guarantor may not assign or transfer any of its interests or rights hereunder without Bank's prior written consent. Guarantor acknowledges that Bank has the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, any Indebtedness of Borrower to Bank and any obligations with respect thereto, including this Guaranty. In connection therewith, Bank may disclose all documents and information which Bank now has or hereafter acquires relating to Guarantor and/or this Guaranty, whether furnished by Borrower, Guarantor or otherwise. Guarantor further agrees that Bank may disclose such documents and information to Borrower.

9. **FINANCIAL REPORTING**. So long as Guarantor has any obligations under or pursuant to this Guaranty, Guarantor will furnish to Bank as soon as the same become available, but in any event: (i) no later than April 30 of each year, a personal financial statement and copies of tax returns when filed if such Guarantor is an individual; (ii) no later than forty-five days after each Fiscal Year-End, a management-prepared income statement, balance sheet and statement of cash flows for the preceding Fiscal Year, all in reasonable detail, including all supporting schedules and comments, if such Guarantor is corporate entity. Guarantor agree to also deliver or cause to be delivered such other information as Bank may reasonably request from time to time, including without limitation other financials statements and information pertaining to Guarantor.

10. **MISCELLANEOUS.** This Guaranty may be amended or modified only in writing signed by Bank and Guarantor. In all cases where there is more than one Borrower named herein, the word "Borrower" shall mean all or any one or more of them as the context requires. If any waiver or other provision of this Guaranty shall be held to be prohibited by or invalid under applicable public policy or law, such waiver or other provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such waiver or other provision or any remaining provisions of this Guaranty. Bank may in its sole discretion, accept a photocopy, electronically transmitted facsimile or other reproduction of this guaranty (a "Counterpart") as the binding and effective record of this Guaranty whether or not an ink signed copy hereof is also received by Bank from the undersigned, provided, however, that if Bank accepts a Counterpart as the binding and effective record hereof, the Counterpart acknowledged in writing by Bank shall constitute the record hereof. The Guarantor agrees that such Counterpart received by Bank, shall, when acknowledged in writing by Bank, constitute an original document for the purposes of establishing the provisions thereof and shall be legally admissible under the best evidence rule and binding on and enforceable against the Guarantor. If Bank accepts a Counterpart as the binding and effective record hereof only such Counterpart acknowledged in writing by Bank shall be marked "Original" and a security interest may only be created in the Guaranty that bears Bank's ink signed acknowledgement and is marked "Original".

*11.* **GOVERNING LAW**. This Guaranty is entered into and performable in Oakland County, Michigan, and the substantive laws, without giving effect to principles of conflict of laws, of the United States and the State of Michigan shall govern the construction hereof, and the rights and remedies of the parties hereto. Guarantor and Bank consent that any legal action or proceeding arising hereunder shall be brought in the State and Federal courts in Oakland County, Michigan, and assent and submit to the personal jurisdiction of any such courts in any such action or proceeding.

**12. <u>JURY WAIVERS</u>. GUARANTOR HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR IN CONNECTION WITH THE TRANSACTIONS RELATED HERETO OR THERETO OR CONTEMPLATED HEREBY OR THEREBY OR THE EXERCISE OF ANY RIGHTS AND REMEDIES HEREUNDER OR THEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. GUARANTOR AGREES THAT BANK MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED AGREEMENT OF GUARANTOR WITH BANK**

IRREVOCABLY TO WAIVE TRIAL BY JURY, AND THAT ANY DISPUTE OR CONTROVERSY WHATSOEVER BETWEEN THEM SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

**GUARANTOR:**

By: _Sladana Krsic_

Name: __Sladana Krsic__

Date: __02-09-17__

**WITNESS:**

By: _____

Name: __SINISA DRAGELJEVIC__

Date: __02/09/17__

## GUARANTY

This Guaranty is made as of January 9, 2017 by Nenad Ignjatovic (the **"Guarantor"**) in favor of **WOODFOREST NATIONAL BANK**, a national banking association, with an address of 28001 Cabot Drive, Suite 240, Novi, MI 48377 (the **"Bank"**). In consideration of any credit or other financial accommodation now or hereafter extended or made to Atlas SN Leasing Inc. (the **"Borrower"**), by Bank and for other valuable consideration, the Guarantor, unconditionally guarantees to Bank the full and prompt payment and performance when due of any and all Indebtedness of the Borrower to Bank. The term "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, performance, obligations and liabilities of Borrower, or any of them heretofore, now or hereafter made, incurred or created, whether direct or indirect, voluntary or involuntary and however arising, whether due or to become due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any loan agreement, note, lease, security agreement, swap, derivative, foreign exchange, hedge, deposit, treasury management or other similar transaction or arrangement, and all modifications, extensions and renewals thereof, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter become unenforceable. This Guaranty is a guaranty of payment and not collection.

**1. CONTINUING LIABILITY; SUCCESSIVE TRANSACTIONS; REVOCATION; OBLIGATION UNDER OTHER GUARANTIES.** This is a continuing guaranty and all rights, powers and remedies hereunder shall apply to all past, present and future Indebtedness of the Borrower to Bank, including that arising under successive transactions which shall either continue the Indebtedness, increase or decrease it, or from time to time create new Indebtedness after all or any prior Indebtedness has been satisfied, and notwithstanding the death, incapacity, dissolution, liquidation or bankruptcy of the Borrower or Guarantor or any other event or proceeding affecting the Borrower or Guarantor. This Guaranty shall not apply to any new Indebtedness created more than fifteen (15) days after actual receipt by Bank of written notice of its termination as to such new Indebtedness; provided however, that loans, advances, leases or other financial accommodations made by Bank to, for or with the Borrower after termination under commitments existing prior to receipt by Bank of such termination, and extensions, renewals or modifications, of any kind, of Indebtedness incurred by the Borrower or committed by Bank prior to receipt by Bank of such termination, shall not be considered new Indebtedness. Any such notice must be sent to Bank by registered U.S. mail, postage prepaid, addressed to its office at the top of this page, or at such other address as Bank shall from time to time designate. Termination of this Guaranty by any single Guarantor will not affect the existing and continuing obligations of any other Guarantor hereunder. The obligations of Guarantor hereunder shall be in addition to any obligations of Guarantor under any other guaranties of any liabilities or obligations of the Borrower or any other persons heretofore or hereafter given to Bank unless said other guaranties are expressly modified or revoked in writing; and this Guaranty shall not, unless expressly herein provided, affect or invalidate any such other guaranties.

**2. OBLIGATIONS JOINT AND SEVERAL; SEPARATE ACTIONS; WAIVER OF STATUTE OF LIMITATIONS; REINSTATEMENT OF LIABILITY.** The obligations hereunder are joint and several and independent of the obligations of Borrower or any other Guarantor and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against the Borrower, any other Guarantor, or any other person, or whether the Borrower, any other Guarantor or any other person is joined in any such action or actions. If more than one person or entity has signed this Guaranty, the obligations of each Guarantor shall be joint and several. Guarantor acknowledges that this Guaranty is absolute and unconditional, there are no conditions precedents to the effectiveness of this Guaranty, and this Guaranty is in full force and effect and is binding on Guarantor as of the date written below, regardless of whether Bank obtains collateral or any guaranties from others or takes any other action contemplated by Guarantor. Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof. The liability of Guarantor hereunder shall be reinstated and revived and the rights of Bank shall continue if and to the extent for any reason any amount at any time paid on account of any Indebtedness guaranteed hereby is rescinded, avoided or must otherwise be restored by Bank, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid. The determination as to whether any amount so paid must be rescinded or restored shall be made by Bank in its sole discretion; provided however, that if Bank chooses to contest any such matter at the request of Guarantor, Guarantor agrees to indemnify and hold Bank harmless from and against all costs and expenses, including reasonable attorneys' fees, expended or incurred by Bank in connection therewith, including without limitation, in any litigation with respect thereto.

**3. AUTHORIZATIONS TO BANK.** Guarantor authorizes Bank either before or after revocation hereof, without notice to or demand on Guarantor, and without affecting Guarantor's liability hereunder, from time to time to: (a) alter, compromise, renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; (b) exchange, enforce,

{01044074-1/4001298/000001}
A-GUARUNLT.1010



**EXHIBIT**

4

Page 1 of 4

waive, subordinate or release any security for the payment of this Guaranty or the Indebtedness or any portion thereof; (c) apply such security and direct the order or manner of sale thereof, including without limitation, a non-judicial sale permitted by the terms of the controlling security agreement, mortgage, or deed of trust, as Bank in its discretion may determine; (d) release or substitute any one or more of the endorsers or any other guarantors of the Indebtedness, or any portion thereof, or any other party thereto; and (e) apply payments received by Bank from the Borrower to any Indebtedness of the Borrower to Bank, in such order as Bank shall determine in its sole discretion, whether or not such Indebtedness is covered by this Guaranty, and Guarantor hereby waives any provision of law regarding application of payments which specifies otherwise. Bank may without notice assign this Guaranty in whole or in part. Upon Bank's request, Guarantor agrees to provide to Bank copies of Guarantor's financial statements.

**4. REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Bank that: (a) this Guaranty is executed at Borrower's request; (b) Guarantor shall not, without Bank's prior written consent, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or a substantial or material part of Guarantor's assets other than in the ordinary course of Guarantor's business; (c) Bank has made no representation to Guarantor as to the creditworthiness of the Borrower; (d) if the Guarantor is a partnership, corporation, limited liability company or other legal entity, the execution, delivery and performance of this Guaranty has been duly authorized by all necessary action on the part of the Guarantor and will not violate any provision of the Guarantor's governing documents; and the person signing this Guaranty on behalf of the Guarantor is duly authorized.

**5. GUARANTOR'S WAIVERS.**(a) Guarantor waives any right to require Bank to: (i) make demand upon, assert claims against or proceed against the Borrower or any other person; (ii) marshal assets or proceed against or exhaust any security held from the Borrower or any other person; (iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from the Borrower or any other person; (iv) take any other action or pursue any other remedy in Bank's power; or (v) make any presentment or demand for performance, or give any notice of extensions, modifications or renewals of Indebtedness, any new transactions between Borrower and Bank and/or any other Guarantor, presentment, nonperformance, protest, notice of default,, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by Bank as security for or which constitute in whole or in part the Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness.

(b) Guarantor waives any defense to its obligations hereunder based upon or arising by reason of: (i) any disability or other defense of the Borrower or any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of the Borrower or any other person; (iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf of the Borrower which is a corporation, partnership or other type of entity, or any defect in the formation of any such Borrower; (iv) the application by the Borrower of the proceeds of any Indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Bank or Guarantor; (v) any act or omission by Bank which directly or indirectly results in or aids the discharge of the Borrower or any portion of the Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against the Borrower; (vi) any impairment of the value of any interest in any security for the Indebtedness or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) or any requirement that Bank give any notice of acceptance of this Guaranty. Until all Indebtedness shall have been paid in full, Guarantor shall have no right of subrogation, and Guarantor waives any right to enforce any remedy which Bank now has or may hereafter have against the Borrower or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by Bank. Guarantor further waives all rights and defenses Guarantor may have arising out of (A) any election of remedies by Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against the Borrower for reimbursement, or (B) any loss of rights Guarantor may suffer by reason of any rights, powers or remedies of the Borrower in connection with any anti-deficiency laws or any other laws limiting, qualifying or discharging Borrower's Indebtedness, whether by operation of law or otherwise, including any rights Guarantor may have to a fair market value hearing to determine the size of a deficiency following any foreclosure sale or other disposition of any real property security for any portion of the Indebtedness.

**6. REMEDIES; NO WAIVER.** All rights, powers and remedies of Bank hereunder are cumulative. No delay, failure or discontinuance of Bank in exercising any right, power or remedy hereunder shall affect or operate as a waiver of such right, power or remedy; nor shall any single or partial exercise of any such right, power or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver,

permit, consent or approval of any kind by Bank of any breach of this Guaranty, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing.

**7. COSTS, EXPENSES AND ATTORNEYS' FEES.** Guarantor shall pay to Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by Bank in connection with the enforcement of any of Bank's rights, powers or remedies and/or the collection of any amounts which become due to Bank under this Guaranty or to enforce or collect any of the Indebtedness, and the prosecution or defense of any action in any way related to this Guaranty.

**8. SUCCESSORS; ASSIGNMENT.** This Guaranty shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties; provided however, that Guarantor may not assign or transfer any of its interests or rights hereunder without Bank's prior written consent. Guarantor acknowledges that Bank has the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, any Indebtedness of Borrower to Bank and any obligations with respect thereto, including this Guaranty. In connection therewith, Bank may disclose all documents and information which Bank now has or hereafter acquires relating to Guarantor and/or this Guaranty, whether furnished by Borrower, Guarantor or otherwise. Guarantor further agrees that Bank may disclose such documents and information to Borrower.

**9. FINANCIAL REPORTING.** So long as Guarantor has any obligations under or pursuant to this Guaranty, Guarantor will furnish to Bank as soon as the same become available, but in any event: (i) no later than April 30 of each year, a personal financial statement and copies of tax returns when filed if such Guarantor is an individual; (ii) no later than forty-five days after each Fiscal Year-End, a management-prepared income statement, balance sheet and statement of cash flows for the preceding Fiscal Year, all in reasonable detail, including all supporting schedules and comments, if such Guarantor is corporate entity. Guarantor agree to also deliver or cause to be delivered such other information as Bank may reasonably request from time to time, including without limitation other financials statements and information pertaining to Guarantor.

**10. MISCELLANEOUS.** This Guaranty may be amended or modified only in writing signed by Bank and Guarantor. In all cases where there is more than one Borrower named herein, the word "Borrower" shall mean all or any one or more of them as the context requires. If any waiver or other provision of this Guaranty shall be held to be prohibited by or invalid under applicable public policy or law, such waiver or other provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such waiver or other provision or any remaining provisions of this Guaranty. Bank may in its sole discretion, accept a photocopy, electronically transmitted facsimile or other reproduction of this guaranty (a "Counterpart") as the binding and effective record of this Guaranty whether or not an ink signed copy hereof is also received by Bank from the undersigned, provided, however, that if Bank accepts a Counterpart as the binding and effective record hereof, the Counterpart acknowledged in writing by Bank shall constitute the record hereof. The Guarantor agrees that such Counterpart received by Bank, shall, when acknowledged in writing by Bank, constitute an original document for the purposes of establishing the provisions thereof and shall be legally admissible under the best evidence rule and binding on and enforceable against the Guarantor. If Bank accepts a Counterpart as the binding and effective record hereof only such Counterpart acknowledged in writing by Bank shall be marked "Original" and a security interest may only be created in the Guaranty that bears Bank's ink signed acknowledgement and is marked "Original".

**11. GOVERNING LAW.** This Guaranty is entered into and performable in Oakland County, Michigan, and the substantive laws, without giving effect to principles of conflict of laws, of the United States and the State of Michigan shall govern the construction hereof, and the rights and remedies of the parties hereto. Guarantor and Bank consent that any legal action or proceeding arising hereunder shall be brought in the State and Federal courts in Oakland County, Michigan, and assent and submit to the personal jurisdiction of any such courts in any such action or proceeding.

**12. JURY WAIVERS. GUARANTOR HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR IN CONNECTION WITH THE TRANSACTIONS RELATED HERETO OR THERETO OR CONTEMPLATED HEREBY OR THEREBY OR THE EXERCISE OF ANY RIGHTS AND REMEDIES HEREUNDER OR THEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. GUARANTOR AGREES THAT BANK MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED AGREEMENT OF GUARANTOR WITH BANK**

**IRREVOCABLY TO WAIVE TRIAL BY JURY, AND THAT ANY DISPUTE OR CONTROVERSY WHATSOEVER BETWEEN THEM SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.**

**GUARANTOR:**

By: _____

Name: __Nenad Ignjatovic__

Date: __2 / 9 / 2017__

**WITNESS:**

By: _____

Name: __SINISA DPAGELSEVIC__

Date: __07/07/17__

Schedule No. ████026-20 to
Master EFA Agreement No. ████026 Dated as of February 9, 2017

## EQUIPMENT FINANCE SCHEDULE

**Borrower:** **Atlas SN Leasing Inc.**     2500 Devon Avenue, Elk Grove Village, IL 60007

**Primary Contact: Sretko Krsic and/or Nenad Ignjatovic**

This is a Schedule to the Master Equipment Finance Agreement (the "Schedule) dated as of February 9, 2017, together with the terms and conditions of the Master Equipment Finance Agreement between the Borrower identified above and **WOODFOREST NATIONAL BANK**, a Texas bank ("Bank"), as such Master Equipment Finance Agreement is identified in Bank's internal books and records, and by the Master Equipment Finance Agreement number identified above (the "Master Agreement"). All capitalized terms not herein defined shall have the meaning set forth in said Master Agreement and all terms and conditions of the Master Agreement are incorporated herein and shall remain in full force and effect except to the extent modified by this Schedule. Such modifications apply only for the Agreement created hereby. Borrower and Bank agree that this Schedule and the Master Agreement as incorporated into this Schedule constitute a separate and distinct "Agreement" under the Master Agreement and if any provision in this Schedule conflicts with a provision in the Master Agreement, the provision in this Schedule shall control. Borrower hereby reaffirms on and as of the date hereof all terms, covenants representations and warranties contained in the Master Agreement.

| | |
|---|---|
| Commencement Date: February 1Ø , 2017 | Interest Rate: 5.00% |
| First Installment Due Date: March 15, 2017 | Number of Installments: **84** |
| Installment amount: | Installment Period:  Monthly in arrears |
| Principal amount of Equipment Finance proceeds disbursed: $1,496,450.00 | Security Deposit: NA |
| | Fees: $500.00 Payable on the First Installment Due Date |

**1. Grant of Security.** Borrower hereby grants to Bank a security interest in the Collateral and all property in Section 3 below.

**2. Promise to Pay:** For value received, Borrower promises to pay to Bank at the Place for Payment, Principal and Interest payable as follows:

    (a) Interest only shall be payable for the period from the Commencement Date to February 15, 2017; payable on the First Installment Due Date at the Interest Rate.

    (b) Eighty-Four (84) consecutive monthly installments of principal and interest, each in the amount of $21,150.69 payable, in arrears, with the first such payment due on the First Installment Due Date, and subsequent payments being due and payable on the 15th day of each calendar month thereafter.

This Agreement may be prepaid in whole at any time by paying to Bank the unpaid principal balance, together with accrued but unpaid interest and late charges, plus a prepayment premium of three percent (3%) of the principal amount prepaid if prepaid during months one through twenty-four (1 - 24), two percent  (2%) during months twenty-five through thirty-six (25 - 36), one percent (1%) during months thirty-seven though forty-eight (37 - 48) and zero percent 0 (%) thereafter. This Agreement shall not be prepaid in part except as a result of Event of Loss.  The amount of such partial prepayment relative to an item of collateral shall be equal to a principal amount, as reasonably determined in Bank's sole discretion, together with accrued but unpaid interest, plus a prepayment premium calculated in accordance with the preceding paragraph with respect to the principal amount prepaid. In the event of such prepayment, Bank may recalculate amortization of the indebtedness evidenced by this Agreement. If Borrower remits to Bank amounts in excess of an Installment that is due hereunder such amounts shall constitute a prepayment and be subject to the prepayment premium as a breakage costs to Bank.  Payment of amounts in excess of the Installment that is due or Installments prior to the due date thereof shall not result in a change to either the total number of Installments or the total sum thereof. Borrower shall pay the Fees and Security Deposit on the First Installment Due Date.

**3.  Equipment Description:** See Exhibit A attached hereto and by this reference made a part hereof.

{01049703-1/4001298/000001}

**EXHIBIT**

**5**

4. **Equipment Location:** 2500 Devon Avenue, Elk Grove Village, IL 60007. The address of the Equipment Location is a bona fide business address.

5. **Waiver; Miscellaneous.** Borrower hereby waives presentment, notice of dishonor, and protest. Borrower agrees that the Commencement Date and the first payment due date may be left blank when this Schedule is executed and hereby authorizes Bank to insert such dates based upon the date the Equipment Finance proceeds are disbursed and authorizes Bank to insert any missing information or change any inaccurate information (such as the model year of the Collateral or its serial number or VIN) into the Collateral Description. BY EXECUTION HEREOF, BORROWER ACKNOWLEDGES THAT BORROWER AGREES THAT THIS SCHEDULE AND ALL OTHER DOCUMENTS EXECUTED IN CONNECTION THEREWITH ARE THE COMPLETE AND EXCLUSIVE STATEMENT OF THE TERMS OF THE AGREEMENT BETWEEN BORROWER AND BANK AND THIS AGREEMENT SUPERSEDES ALL PRIOR AGREEMENTS AND COMMUNICATIONS, WHETHER ORAL OR WRITTEN, BETWEEN BORROWER AND BANK REGARDING THE SUBJECT MATTER HEREOF.

6. **Additional Provisions:** _____NA_____

**IN WITNESS WHEREOF**, the parties have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

**Bank:** WOODFOREST NATIONAL BANK

By: _Peggy A Cummins_
Name: _Peggy A Cummins_
Title: _Senior Vice President_

**BORROWER:** Atlas SN Leasing Inc.

By: _Sketko Krsic_
Name: _Sketko Krsic_
Title: _President_

**EXHIBIT A**

**EQUIPMENT SCHEDULE**

This Exhibit A is attached to and becomes part of the certain Schedule No. ▮▮▮-026-20 dated as of February  9 , 2017 between Woodforest National Bank, ("Bank") and the undersigned Borrower to the Master Equipment Finance Agreement dated as of February 9, 2017.

| Quantity | | Serial No. | Manufacturer, Model No., Description |
|---|---|---|---|
| 50 | 001 | 1GRAA0621JT102813 | Great Dane Trailers Model Year 2018 |
| | 002 | 1GRAA0623JT102814 | CS1-1314-21053 Dry Vans |
| | 003 | 1GRAA0625JT102815 | |
| | 004 | 1GRAA0627JT102816 | |
| | 005 | 1GRAA0629JT102817 | |
| | 006 | 1GRAA0620JT102818 | |
| | 007 | 1GRAA0622JT102819 | |
| | 008 | 1GRAA0629JT102820 | |
| | 009 | 1GRAA0620JT102821 | |
| | 010 | 1GRAA0622JT102822 | |
| | 011 | 1GRAA0624JT102823 | |
| | 012 | 1GRAA0626JT102824 | |
| | 013 | 1GRAA0628JT102825 | |
| | 014 | 1GRAA062XJT102826 | |
| | 015 | 1GRAA0621JT102827 | |
| | 016 | 1GRAA0623JT102828 | |
| | 017 | 1GRAA0625JT102829 | |
| | 018 | 1GRAA0621JT102830 | |
| | 019 | 1GRAA0623JT102831 | |
| | 020 | 1GRAA0625JT102832 | |
| | 021 | 1GRAA0627JT102833 | |
| | 022 | 1GRAA0629JT102834 | |
| | 023 | 1GRAA0620JT102835 | |
| | 024 | 1GRAA0622JT102836 | |
| | 025 | 1GRAA0624JT102837 | |
| | 026 | 1GRAA0626JT102838 | |
| | 027 | 1GRAA0628JT102839 | |
| | 028 | 1GRAA0624JT102840 | |
| | 029 | 1GRAA0626JT102841 | |
| | 030 | 1GRAA0628JT102842 | |
| | 031 | 1GRAA062XJT102843 | |
| | 032 | 1GRAA0621JT102844 | |
| | 033 | 1GRAA0623JT102845 | |
| | 034 | 1GRAA0625JT102846 | |
| | 035 | 1GRAA0627JT102847 | |
| | 036 | 1GRAA0629JT102848 | |
| | 037 | 1GRAA0620JT102849 | |
| | 038 | 1GRAA0627JT102850 | |
| | 039 | 1GRAA0629JT102851 | |
| | 040 | 1GRAA0620JT102852 | |
| | 041 | 1GRAA0622JT102853 | |
| | 042 | 1GRAA0624JT102854 | |
| | 043 | 1GRAA0626JT102855 | |
| | 044 | 1GRAA0628JT102856 | |
| | 045 | 1GRAA062XJT102857 | |
| | 046 | 1GRAA0621JT102858 | |
| | 047 | 1GRAA0623JT102859 | |
| | 048 | 1GRAA062XJT102860 | |
| | 049 | 1GRAA0621JT102861 | |
| | 050 | 1GRAA0623JT102862 | |



This Exhibit is herby verified as correct by the undersigned Borrower.

Borrower:   Atlas SN Leasing Inc.

Authorized Signature of Borrower

By:

Its: